In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-3239 & 08-4038

BKCAP, LLC, GRAYCAP, LLC, AND SWCAP, LLC,

*Plaintiffs-Appellants,*

*v.*

CAPTEC FRANCHISE TRUST 2000-1,

*Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:07-cv-00637-CAN—**Christopher A. Nuechterlein**, *Magistrate Judge.*

ARGUED APRIL 6, 2009—DECIDED JULY 13, 2009
AMENDED AUGUST 5, 2009

Before BAUER, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This case demonstrates that even experienced, sophisticated business entities can encounter difficulty when drafting carefully negotiated loan documents. Since July 2007, the plaintiffs and the defendant have been at loggerheads over the meaning of just a handful of lines out of several hundred in their five-page, single-spaced Note. Unfortunately, this appeal cannot

bring their stalemate to an end, and more litigation lies ahead. However, while disputes over the meaning of language in loan documents can be somewhat dry, this one is more interesting than most such cases.

The plaintiffs, special purpose entities that we refer to as "Borrowers," obtained several $1 to 2 million mortgage finance loans from the defendant, or "Lender." Each of the loans required Borrowers to pay off the debt at around 10% interest over 15 to 20 years. Borrowers had the right to pay off the loans early, but subject to a "Prepayment Premium" if they prepaid before ten years into the loan terms. When Borrowers tried to prepay the loans after only eight years, the parties disagreed on how to calculate the Prepayment Premium. Their dispute led to this diversity action, in which the parties seek a declaratory judgment as to the correct interpretation of the Prepayment Premium. The district court granted summary judgment in favor of Lender, concluding that the unambiguous contract language supported Lender's interpretation. We conclude, however, that the contract is ambiguous, making it inappropriate to resolve the meaning of the contract at the summary judgment stage. We therefore remand for a trial on the question of the parties' intended meaning of the Prepayment Premium.

## I.  Background

Borrowers are wholly owned subsidiaries of "Quality Dining, Inc.," which owns several franchise restaurants, mostly "Chili's" and "Burger King," in several states that include Indiana, Michigan, and Pennsylvania. In 1999,

Quality Dining decided to refinance a significant portion of the bank debt associated with operating these restaurants. Borrowers negotiated with "Captec Financial" and "GE Capital" to obtain approximately $49 million in mortgage financing to pay down Quality Dining's bank debt. The total $49 million consisted of 34 separate loans of about $1 to 2 million, each secured by one of Quality Dining's restaurants. The interest rate was 9.79% for the "Burger King" loans and 9.94% for the "Chili's" loans, and the various loans had terms of either 15 or 20 years.

During the course of negotiations, Borrowers received Captec Financial's standard-form Promissory Note for its "Franchise Loan Program." The Note allowed Borrowers to pay off their loans early, but only if they paid a "Prepayment Premium," defined as:

> equal to the present value (computed at the Reinvestment Rate) of the difference between a stream of monthly payments necessary to amortize the outstanding principal balance of this Note at the Stated Rate and a stream of monthly payments necessary to amortize the outstanding principal balance of this Note at the Reinvestment Rate (the "Differential"). In the event the Differential is less than zero, the Prepayment Premium shall be deemed zero. . . .

Put another way, if interest rates fell and Borrowers decided to prepay the Note, they would have to pay a penalty equal to the difference between:

(1) the present value of the stream of monthly payments provided by the loan's amortization

schedule from the date of prepayment, computed at the "Reinvestment Rate"—i.e., the U.S. Treasury rate at the date of prepayment; and

(2) the present value of the same stream of monthly payments computed at the "Stated Rate"—i.e., the stated interest rate of the loan.

Borrowers were unsatisfied with the standard-form Prepayment Premium. They wanted the right to prepay without penalty after the first ten years of the loan terms. Captec Financial agreed to this modification and redrafted the Note to define the Prepayment Premium as:

equal to the positive difference between the present value (computed at the Reinvestment Rate) of the stream of monthly payments of principal and interest under this Note from the date of the prepayment through the tenth (10th) anniversary of the First Full Payment Date at the Stated Rate . . . and the outstanding principal balance of this Note as of the date of the prepayment (the "Differential"). In the event the Differential is less than zero, the Prepayment Premium shall be deemed to be zero.
. . .

The revised Note also required Borrowers to provide a "Prepayment Notice" at least thirty days before exercising their right to prepay.

In August 1999, Borrowers executed thirty-four of these Notes, representing eighteen loans originating with Captec Financial and sixteen originating with GE Capital. All of

the Notes contained identical language, including the revised definition of the Prepayment Premium quoted above. Captec Financial assigned five of its Notes to "Capmark" and the remaining thirteen Notes to "Captec Trust," which is "Lender" in this action.

Around June 2007, Borrowers prepaid the sixteen Notes held by GE Capital and the five Notes held by Capmark. In accepting Borrowers' prepayment, both GE Capital and Capmark calculated the Prepayment Premium as the difference between the present value of the stream of monthly payments from the date of prepayment through year 10 computed at the Reinvestment Rate and at the Stated Rate. This calculation, which compares the present value of the stream of monthly payments computed at the two different rates, is consistent with the definition of the Prepayment Premium provided by Captec Financial's original, standard-form Note.

Borrowers then sent Lender a Prepayment Notice for the twelve remaining Notes. (Borrowers had already prepaid the thirteenth Note held by Lender without penalty after the restaurant securing that Note was damaged by fire.) However, Borrowers made their notice contingent on Lender's acceptance of the formula used by GE Capital and Capmark to compute the Prepayment Premium. Lender rejected that formula as inconsistent with the language of the Notes, which Lender interpreted to provide a significantly higher Prepayment Premium. By way of illustration, for one of the $1.4 million loans held by Lender, Borrowers' formula yielded a Prepayment Premium of around $17,000, while Lender's formula

yielded a Prepayment Premium of around $100,000. The difference between the parties' calculations for the total Prepayment Premium due on all twelve Notes is about $800,000, an amount worthy of the litigation effort expended here.

Borrowers did not provide another Prepayment Notice or tender any prepayment amount. Instead, Borrowers filed suit in Indiana state court seeking a declaratory judgment that their interpretation of the Prepayment Premium was correct. Borrowers' complaint also contained a breach of contract claim for Lender's refusal to accept a prepayment computed under Borrowers' formula. Lender removed the case to federal court based on diversity jurisdiction, and the parties consented to conduct the proceedings before a magistrate judge. *See* 28 U.S.C. § 636(c). The district court granted Lender's motion for summary judgment as to Borrowers' declaratory judgment claim, concluding that the unambiguous contract language supported Lender's interpretation of the Prepayment Premium. Borrowers appeal.

## II.  Analysis

### A.  Appellate Jurisdiction

We begin by ensuring that we have jurisdiction over this appeal. Generally, federal courts of appeals are limited to reviewing the "final decisions" of district courts. 28 U.S.C. § 1291. A decision is "final" for purposes of § 1291 if the district court's order "ends the litigation on the merits and leaves nothing for the court to do but execute

the judgment." *Star Ins. Co. v. Risk Mktg. Group Inc.*, 561 F.3d 656, 659 (7th Cir. 2009) (quotation omitted). In contrast, an order that disposes of only one claim in a multi-count complaint is typically non-final and therefore non-appealable. *Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 714 F.2d 740, 743 (7th Cir. 1983).

A potential jurisdictional snag arises in this case because, although the district court entered a final judgment in favor of Lender and against Borrowers, the court purported to resolve only one of Borrowers' two claims. In its opinion and order accompanying the judgment, the court stated that it was only considering Lender's motion for summary judgment "as it pertains to the Borrower's [sic] declaratory judgment action." The court declined to resolve Borrowers' breach of contract claim "because there are issues as to whether that claim is ripe."

Although the district court's failure to address Borrowers' breach of contract claim gives us pause, we conclude that the court's order "effectively end[ed] the litigation and thus constitute[d] a final order for the purposes of appellate review." *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1093, 1097 (7th Cir. 2008). The court entered a final judgment in favor of Lender that drew no distinction between Borrowers' two claims, and a docket entry accompanying the court's order stated, "Civil Case Terminated." This record suggests that the court had "finished with the case," *Hill v. Potter*, 352 F.3d 1142, 1144 (7th Cir. 2003), and did not "contemplate[] further activity" on Borrowers' breach of contract claim, *Star Ins. Co.*, 561 F.3d at 659 (quotation omitted).

Additionally, an examination of Borrowers' complaint illustrates that their breach of contract claim cannot survive the district court's judgment on their declaratory judgment claim. Borrowers' complaint alleged a breach of contract based on Lender's "demanding a prepayment premium in excess of that contemplated by the terms of the . . . Notes, . . . and/or by rejecting Borrowers' Prepayment Notice and/or its proffered computation of the prepayment premium." These allegations establish that Borrowers' Prepayment Notice could be effective, and Lender's rejection of that notice could be a breach of contract, only if Borrowers' interpretation of the Prepayment Premium was correct. Yet the district court rejected that interpretation as unsupported by the contract language. In doing so, the court necessarily rejected Borrowers' breach of contract claim, leaving no suggestion that Borrowers might reassert that claim "at some future date." *Am. Nat'l Bank & Trust Co. v. Equitable Life Assur. Soc'y of U.S.*, 406 F.3d 867, 875 (7th Cir. 2005).

Finally, we note that both parties agreed at oral argument that Borrowers' breach of contract claim hinged on the success of their declaratory judgment claim, meaning that the district court's rejection of the latter ended the entire suit. We do not, of course, simply accept this stipulation that appellate jurisdiction exists, since jurisdictional defects are non-waivable. *Stevens v. Turner*, 222 F.2d 352, 354 (7th Cir. 1955). Still, the parties' agreement on this point supports our own conclusion that, in entering judgment against Borrowers on their declaratory judgment claim, the district court effectively disposed of Borrowers' breach of contract claim. *See Am. Family Mut.*

*Ins. Co. v. Jones*, 739 F.2d 1259, 1261 n.1 (7th Cir. 1984) (noting the defendants' agreement at oral argument that their counterclaim could not survive the judgment in favor of the plaintiff's claim, such that the district court's failure to resolve the counterclaim did not defeat appellate jurisdiction); *cf. Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 774 n.4 (7th Cir. 2002) (concluding that a judgment that failed to mention one of two defendants effectively ended the litigation on the merits, where the plaintiffs stated at oral argument that their prior voluntary dismissal of that defendant was with prejudice). The district court's decision was final within the meaning of § 1291, and our appellate jurisdiction is secure.

## B. Contract Interpretation

We review de novo the district court's interpretation of a contract, including the court's conclusion that the contract language was unambiguous. *Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835 (7th Cir. 2002). In this diversity action, state law provides the substantive contract principles that guide our analysis, and federal procedural rules control the process. *See Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000). Under the Notes' choice-of-law provision, each Note is governed by the law of the State in which the restaurant securing the Note is located. Of the twelve Notes that are the subject of this appeal, seven are secured by restaurants in Michigan, four by restaurants in Indiana, and one by a restaurant in Pennsylvania.

Under the substantive contract principles for each of the three controlling jurisdictions, the goal of contract interpretation is to ascertain the parties' intent. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 906 (Ind. 2004); *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005); *Ins. Adjustment Bureau v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language. *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997); *City of Grosse Pointe Park*, 702 N.W.2d at 113; *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004). If the contract language is clear and unambiguous, the document is interpreted as a matter of law without looking to extrinsic evidence. *Automation by Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753-54 (7th Cir. 2006) (applying Indiana law); *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 454 (Mich. 2003); *Ins. Adjustment Bureau*, 905 A.2d at 468-69. If, however, the contract language is ambiguous, an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent. *Automation by Design*, 463 F.3d at 753-54; *Klapp*, 663 N.W.2d at 453-54; *Ins. Adjustment Bureau*, 905 A.2d at 468-69.

Beginning with the plain language of the contract in this case, the Notes define the Prepayment Premium in terms of a "Differential." That Differential equals:

the positive difference between the present value (computed at the Reinvestment Rate) of the stream of monthly payments of principal and interest

under this Note from the date of the prepayment through the tenth (10th) anniversary of the First Full Payment Date at the Stated Rate . . . and the outstanding principal balance of this Note as of the date of the prepayment . . . .

This language is clear in that it plainly identifies the two variables used to calculate the Differential:

(1) the present value of the stream of monthly payments that Borrowers were scheduled to make from the date of prepayment through year 10 of the loan; and

(2) the outstanding principal balance at the date of prepayment.

Unfortunately, we cannot adopt this plain-language reading of the Prepayment Premium because doing so "would produce absurd results." *Beanstalk Group*, *Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). As illustrated by calculations that Lender submitted with its motion for summary judgment, even if the Reinvestment Rate (i.e., the U.S. Treasury rate) drops substantially, the first "stream of monthly payments" variable is always smaller than the second "outstanding principal balance" variable. Hence, subtracting the two variables yields a Prepayment Premium that is always negative and therefore "deemed to be zero" under the contract. That was not the intent of the parties, who, as rational business entities, *see id.*, agree that the purpose of the Prepayment Premium is to provide *some* penalty in the event that Borrowers prepay.

So while the contract language defining the Prepayment Premium is clear, it is nonetheless ambiguous because it makes no economic sense. Since the literal application of the text "'would lead to absurd results'" and "'thwart the obvious intentions of its drafters,'" we cannot rely on the plain language of the contract. *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) (quoting *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998)). Instead, the interpretation of these Notes requires an examination of extrinsic evidence. *See id.*

Lender suggests that we may avoid finding an ambiguity by reading the "stream of monthly payments" variable to include a final "balloon payment" of the entire outstanding principal balance at year 10. Under this reading, the Prepayment Premium becomes the difference between:

(1) the present value of the stream of monthly payments from the date of prepayment through year 10, *plus* the outstanding principal balance at year 10; and

(2) the outstanding principal balance at the date of prepayment.

Lender argues that including this balloon payment is necessary in order to produce a positive Prepayment Premium and avoid an absurd result.

Although Lender's formula has the virtue of producing a positive Prepayment Premium, Lender's concept of a "balloon payment" finds no support in the contract language. The Notes' plain language defines the first

variable of the Differential as simply the stream of monthly payments from the date of prepayment through year 10, with no indication that this stream contains a final payment of the outstanding principal. As discussed above, this language is ambiguous because it makes no economic sense, and we cannot simply ignore the ambiguity by patching up the contract language with Lender's suggested balloon payment term. *Cf. Klapp*, 663 N.W.2d at 453 ("[C]ourts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity . . . .").

We also think that Lender's reliance on the rule of interpreting contracts to avoid absurd results is misplaced. Courts apply this rule to reject one party's strained, literal reading of contract language in favor of the other party's reasonable, commonsense reading. *See Beanstalk*, 283 F.3d at 859-60 (granting judgment for the defendant even though the plaintiff's broad reading of a representation agreement's terms was literally correct); *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1118-19 (7th Cir. 2002) (rejecting the plaintiff's contractual interpretation that made no economic sense and granting judgment for the defendant); *Merheb v. Ill. State Toll Highway Auth.*, 267 F.3d 710, 713 (7th Cir. 2001) (rejecting an employee's literal, "insane" reading of a workplace discipline manual and granting judgment for the employer); *Nuckolls*, 682 N.E.2d at 539-40 (concluding that an insurer's broad, literal reading of a coverage exclusion would produce an absurd result and construing the contract in favor of the insured). But here, Lender is trying to avoid the absurdity of its own literal reading of the contract. Lender cannot first argue that the plain language of the contract supports its inter-

pretation of the Prepayment Premium, but then argue that the absurdity of that same plain-language interpretation necessitates an additional balloon payment term.

Like Lender, Borrowers argue that they are entitled to summary judgment without further consideration of extrinsic evidence. Borrowers acknowledge that the Notes are ambiguous but cite the rule that courts construe ambiguities against the drafter, who in this case was Lender's predecessor in interest. *MPACT Constr. Group*, 802 N.E.2d at 910; *Klapp*, 663 N.W.2d at 454; *Ins. Adjustment Bureau*, 905 A.2d at 468. Borrowers contend that this rule permits us to conclude as a matter of law that their interpretation of the Prepayment Premium is correct.

We question Borrowers' premise that the rule of construing ambiguities against the drafter gives courts a license to bypass relevant, extrinsic evidence in favor of simply declaring judgment for the non-drafter. Borrowers' argument undoubtedly fails with respect to the seven Notes in this case governed by Michigan law. The Michigan Supreme Court has described the rule as a "tie-breaker" to be applied only "if all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have left the jury unable to determine what the parties intended their contract to mean." *Klapp*, 663 N.W.2d at 455. Similarly, with respect to the single Note governed by Pennsylvania law, the Pennsylvania courts do not construe ambiguous contracts against the drafter as a matter of law before looking to extrinsic evidence. Rather, "inquiry should always be made into the circumstances surrounding the

execution of the document," and "only when such an inquiry fails" should courts "conclude the matter against the party responsible for the ambiguity, the drafter of the document." *Burns Mfg. Co. v. Boehm*, 356 A.2d 763, 767 n.3 (Pa. 1976) (citations omitted); *see also Kripp*, 849 A.2d at 1165 (concluding that the trial court properly resolved an ambiguous agreement through parol evidence of the parties' intent rather than "a construction of contractual terms"); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 n.5 (Pa. 1986) ("Our first obligation is to examine the extrinsic evidence and resort to rules of construction only should that examination prove fruitless.").

Indiana arguably applies the rule of construing ambiguities against the drafter more liberally, and the Indiana Supreme Court has occasionally applied the rule without considering whether extrinsic evidence would clarify the parties' intent. *See MPACT*, 802 N.E.2d at 910 ("When there is ambiguity in a contract, it is construed against its drafter."); *Nuckolls*, 682 N.E.2d at 538 ("When an insurance contract contains an ambiguity, it should be strictly construed against the insurance company."); *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985) (holding that insurers' extrinsic evidence was inadmissible to clarify an ambiguous coverage provision). So at least with respect to the four Notes governed by Indiana law, Borrowers' argument that they are entitled to summary judgment on an ambiguous contract carries some force. Still, we think that Borrowers can prevail under the rule of construing ambiguities against the drafter only if they offer an interpretation of the Notes that is

reasonably consistent with the contract language. *See MPACT,* 802 N.E.2d at 910 (concluding that certain contractual provisions "support both [parties'] arguments" and therefore construing against the drafter); *Showboat Marina Casino P'ship v. Tonn & Blank Constr.*, 790 N.E.2d 595, 598-99 (Ind. Ct. App. 2003) (recognizing the nondrafter's right to sue on a contract that contained language consistent with both the right to sue and mandatory arbitration). Unfortunately, Borrowers' interpretation is inconsistent with the plain language of the Notes.

As mentioned above, Borrowers' interpretation defines the Prepayment Premium as the difference between:

(1) the present value of the stream of monthly payments from the date of prepayment through year 10 computed at the Reinvestment Rate; and

(2) the present value of the same stream of monthly payments computed at the Stated Rate of the Note.

To arrive at this formula, Borrowers must make sweeping changes to the contract language defining the Prepayment Premium, illustrated as follows with the added word in italics and the deleted language stricken out:

. . . equal to the positive difference between the present value (computed at the Reinvestment Rate) of the stream of monthly payments of principal and interest under this Note from the date of the prepayment through the tenth (10th) anniversary of

the First Full Payment Date *[and]* at the Stated Rate . . . ~~and the outstanding principal balance of this Note as of the date of the prepayment~~ (the "Differential"). . . .

Borrowers' insertion of an "and" before the "at the Stated Rate" clause completely changes the second variable used to calculate the Differential, replacing the "outstanding principal balance" variable with a new "stream of monthly payments" variable. Equally problematic, Borrowers' interpretation omits the "outstanding principal balance" clause from the contract, rendering that term mere surplusage. *See Klapp*, 663 N.W.2d at 453 ("[C]ourts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." (quotation omitted)). In short, Borrowers' interpretation is unreasonable because it is completely inconsistent with the contract language, and we cannot adopt this interpretation under the rule of construing ambiguities against the drafter. Instead, the meaning of the Prepayment Premium is a question of fact that requires an examination of relevant extrinsic evidence. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995).

### III. Conclusion

Because the contract language defining the Prepayment Premium is ambiguous, resolving the meaning of the contract on summary judgment was inappropriate. We REMAND for a trial on the question of the parties' intended

meaning of the Prepayment Premium. Circuit Rule 36 shall apply on remand.