In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1956

AEROGROUND, INC.,
d/b/a Menzies Aviation,

*Plaintiff-Appellant*,

*v.*

CENTERPOINT PROPERTIES TRUST,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10-cv-00652 — **Sharon Johnson Coleman**, *Judge.*

ARGUED DECEMBER 4, 2013 — DECIDED DECEMBER 23, 2013

Before FLAUM, EASTERBROOK, and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* In 2007, two companies—Menzies and CenterPoint—entered into a ten-year lease for a warehouse near O'Hare Airport. CenterPoint, the lessor, owns the warehouse; Menzies, the lessee, operates an air cargo handling business, which includes the use of 15,000- and 30,000-pound forklifts. It did not take long for these heavy forklifts to severely damage the concrete slab on

which the machines operated. The parties dispute who is responsible for fixing the damage, at a cost of about $1 million. Under the lease, Menzies is responsible for repairing the warehouse's "floor," while CenterPoint is responsible for repairing its "foundation." Menzies sued. After a bench trial, the district court concluded that the damage affected only the surface of the concrete slab—i.e., it affected the slab's function as a floor, not its function as a foundation. Therefore, Menzies was not entitled to recover. We affirm.

## I. Background

Aeroground Inc., which does business as Menzies Aviation ("Menzies"), operates an air cargo handling business. CenterPoint Properties Trust ("CenterPoint") is a real estate investment trust that owns a warehouse near O'Hare Airport. The facility is a single-story structure—a 185,280 square-foot warehouse built in 1998 or 1999, plus a large addition built in 2007. Another company used the building to store airplane parts from 1999 until 2006.

In February 2007, Menzies and CenterPoint entered into a lease for the building. After a dispute, the parties mutually terminated that lease and signed a new, ten-year lease in November 2007. Between February and November, CenterPoint constructed various improvements to the building, at Menzies' request, including increasing the number of dock doors from two to thirty-eight and installing 45,000-pound dock levelers. These improvements cost CenterPoint about $1.4 million.

When Menzies began moving its air cargo handling operations into the building in November 2007, the six-inch concrete slab did not exhibit any visible damage. By January

2009, the concrete slab had begun to deteriorate. The damage—"cracking, scaling of the concrete surface, and raveling along contraction joints"—was not consistent with typical wear and tear. The slab could not support Menzies' heavy forklifts, which were typical of its field. Menzies told CenterPoint about these problems in January 2009. CenterPoint paid for some repairs (at a cost of about $92,000), but then stopped doing so. CenterPoint did not submit an insurance claim. The parties agree that the concrete slab is so damaged that it must be replaced, at an estimated cost of between $966,000 (the cost of a new, identical floor) and $1.23 million (the cost of a new floor that would permit heavy forklift operation).

As relevant here, Menzies sued CenterPoint for breach, and CenterPoint counterclaimed. Both parties contended that the other was responsible for replacing the concrete slab and had breached the lease by failing to replace the slab. After a bench trial, the federal district court held that neither party was entitled to recover. The court found that the concrete slab had a "dual nature as both floor and foundation," but "the damage at issue was related to the slab's function as a floor." The damage was therefore Menzies' responsibility since Menzies is responsible for the "floor"—not CenterPoint's responsibility, which includes the "foundation." However, CenterPoint lost on its counterclaim, because the lease required that it give timely notice to Menzies if Menzies allegedly breached, and CenterPoint did not do so. Only Menzies appeals.

## II. Discussion

In an appeal from a bench trial, we review for clear error the district court's findings of fact and its applications of law

to those findings of fact. *Egan Marine Corp. v. Great Am. Ins. Co. of New York*, 665 F.3d 800, 811 (7th Cir. 2011). A finding is "clearly erroneous" when, even though there is evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Winforge, Inc. v. Coachmen Indus.*, 691 F.3d 856, 868 (7th Cir. 2012) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "The party alleging error bears the burden of demonstrating that particular factual findings were clearly erroneous." *Id.* We review de novo the district court's interpretation of a contract as well as its conclusion that a contract is ambiguous. *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 358 (7th Cir. 2009). If we find the contract ambiguous, then the district court's interpretation is a factual one, reviewed for clear error. *Wikoff v. Vanderveld*, 897 F.2d 232, 238 (7th Cir. 1990).

Where, as here, our jurisdiction is based on diversity, the resolution of substantive issues is determined by the applicable state law. *LaSalle Nat. Bank v. Serv. Merch. Co.*, 827 F.2d 74, 78 (7th Cir. 1987). The parties agree that Illinois law applies. Under Illinois law, the interpretation of a lease "is governed by the rules which govern contracts." *Midland Mgmt. Co. v. Helgason*, 158 Ill. 2d 98, 103 (1994). We therefore apply Illinois principles of contract interpretation. The goal of contract interpretation is to ascertain the parties' intent, and in so doing, we first look to "the plain and ordinary meaning" of the contract language. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). We must construe the contract "as a whole, viewing each part in light of the others." *Id.* We also must seek to give effect to "each clause and word used," without rendering any terms meaningless. *Hufford v. Balk*, 113 Ill. 2d 168, 172 (1986). The more specific provision of a

contract governs where it arguably conflicts with a more general provision. *Grevas v. U.S. Fidelity & Guar. Co.*, 152 Ill. 2d 407, 411 (1992).

## A. The terms of the lease

We begin by summarizing the lease's terms. The lease does not use the term "slab" or "concrete slab," nor does it define "floor" or "foundation." The lease does state that the permitted uses for the warehouse include air cargo handling and storage. Moreover, Menzies "agree[d] to accept the Premises in an absolutely 'as is' condition," and CenterPoint did "not make warranties" as to the premises. The lease defines "Improvements" as the existing building and the building expansion. The lease divides responsibility for repairs as follows:

> **Section 7.1. <u>Tenant's Obligations</u>.** Except as set forth in Section 7.2, Tenant assumes full and sole responsibility for the condition, operation, repair, alteration, improvement, replacement, maintenance and management of the Premises. … Except as set forth in Section 7.2, Tenant shall, at its sole cost and expense, promptly perform all maintenance and promptly make all necessary repairs and replacements, ordinary as well as extraordinary, foreseen as well as unforeseen, in and to the Premises and any equipment now or hereafter located in the Premises, including, but not limited to, all floors, floor coverings, windows, glass, plate glass, ceilings, … .

> **Section 7.2. Landlord's Obligations.** … Landlord shall maintain, repair and replace the roof, exterior walls, foundation and structural portions of the Improvements … and all exterior portions of the Project. … Landlord shall repair and replace the exterior walls, roof and foundation of the building that is a part of the Improvements. The cost of all repairs and replacements under this Section … shall be the sole responsibility of Landlord, except to the extent such costs arise as a result of any act or omission of Tenant … .

> **Section 9.1. Restoration.** In the event the Improvements shall be damaged or destroyed, in whole or in part, Landlord covenants and agrees that, unless otherwise provided in the Ground Lease, Landlord shall repair, restore or rebuild any such Improvements so damaged, injured or partially destroyed, or erect, finish and complete a like building … .

The lease also requires that Menzies carry several types of insurance and that CenterPoint carry "insurance on all Improvements against … all … risks of direct physical loss."

To summarize, Section 7.1 makes Menzies responsible for repairing "all floors," while Section 7.2 (usually) makes CenterPoint responsible for repairing the "foundation." CenterPoint is also responsible, under Section 9.1, for repairs or reconstruction if the building is partially or totally damaged. For the reasons explained below, we agree with the district court that this lease is ambiguous, and that CenterPoint is not responsible for repairing the slab.

**B. Section 7.1 vs. Section 7.2**

The lease does not specifically define the floor or the foundation, nor does it indicate how precisely to distinguish between Section 7.1's floor repair obligations and Section 7.2's foundation repair obligations. When we consider the ordinary meaning of the relevant terms, foundation means "an underlying base or support; *especially* the whole masonry substructure of a building." MERRIAM-WEBSTER DICTIONARY ONLINE, available at http:// merriam-webster.com/dictionary (last visited December 19, 2013). "Floor" means "the level base of a room"; "the part of a room on which you stand." *Id.*

The district court found that the evidence established that the concrete slab had a "dual nature as both floor and foundation." It functioned as a floor because "[t]he slab is the surface upon which [Menzies'] operations are conducted, including the movement of cargo loads." But Menzies presented evidence that "the slab also has a structural function: by connection to the building walls through the dowel rods, it bears loads transferred from the walls."[1] The court found that the damage at issue solely concerned the "slab's function as a floor." And in their pre-lawsuit communications, both parties repeatedly referred to the

---

[1]CenterPoint argues that the slab does not function as a foundation, and relies upon the trial testimony of the structural engineer who prepared the structural drawings for the warehouse. This engineer testified at trial that the concrete slab provides no vertical support for the walls or roof and thus is not part of the foundation. However, he said that in some cases, this type of concrete slab could provide *horizontal* support. He was unsure whether it did in this case. Given this uncertainty, we cannot say that the district court's factual finding was clearly erroneous.

condition of the "floor." Menzies' letter to CenterPoint had the heading, "Floor Breaking Up," and multiple Menzies vice presidents referred to the "floor" in their emails to CenterPoint.[2] When a contract is ambiguous, it is permissible to consider extrinsic evidence such as these pre-lawsuit communications. *See Gallagher*, 226 Ill. 2d at 233. Thus, we find that Section 7.2 (which makes CenterPoint responsible for repairing the foundation) is inappaircable because of the meaning of the terms in conjunction with the district court's factual findings. The parties' communications further buttress this conclusion.

Menzies argues that the damage was in fact to the foundation, but the district court found otherwise. Multiple engineers testified at trial that the "foundation elements" of the building were a perimeter trench-footing set at four feet below the concrete slab and drilled concrete piers set in the ground, supporting the columns that hold up the roof. There is no evidence of damage to these foundation elements. As a result, the court's determination is not clearly erroneous on this record.

Menzies next contends in its brief that the parties meant to allocate responsibility to CenterPoint for "the top, sides, and bottom of the building." This contention is imprecise, however. CenterPoint was responsible for *the outer shell* of the warehouse—the roof, exterior walls, and foundation—

---

[2]For example, Aeroground's Senior Vice President, who signed the lease, wrote in an email to CenterPoint: "We have never seen a floor break-up like this"; "[t]here is obviously a flaw with the floor"; and "they have never seen a floor degrade in this manner." Aeroground's Regional Vice President similarly wrote in an email, "we cannot accept your request to take on the costs to any further repairs to the floor."

while Menzies was responsible for *the inner shell* of the warehouse, including the floor and ceiling. Menzies' chosen term, "bottom," could refer to either the floor or the foundation. "Bottom" is not in the lease, though, and is less precise than the lease's terms. This argument asks us to overlook the express terms of the lease (and the district court's factual findings), and is therefore unpersuasive.

Menzies also argues that the district court rewrote the lease by introducing a "functionality" test to determine what was the "floor" and what was the "foundation." There are multiple flaws with Menzies' argument. First, in the district court, Menzies suggested the use of a functionality test by arguing that the concrete slab failed in its "ability to provide support." The district court adopted this analytical approach, but its use was ultimately to Menzies' detriment. Second, the district court confronted multiple undefined terms, and the dictionary definition actually pointed toward functionality because something is a "foundation" if it provides support. In other words, the district court's functionality test was a means of implementing the parties' contract, because the parties chose to use a key term that is defined by its function. Indeed, the district court's analytical method has further support when one considers other terms in these two sections of the lease. Specifically, as noted above, there is a parallelism in this part of the lease: one party is responsible if there is damage to the floor or the ceiling, while the other is responsible if there is damage to the foundation or the roof. The parties intended, in most instances, for Menzies to take care of the inside of the building, while CenterPoint was responsible for the outside and undergirding of the building. Since a concrete floor inside *could* have weight-bearing potential (or be connected

to the outside), the parties' division of responsibility suggested a functional analysis.

Menzies argues that the concrete slab failed due to various inadequacies that are "all attributable to CenterPoint." CenterPoint responds that it made $1.4 million in changes to the warehouse, all at Menzies' request, but that Menzies failed to specify that it needed a thicker concrete slab—even though Menzies inspected the warehouse beforehand and knew the slab's thickness. These arguments are really about whether the premises were fit for heavy air cargo handling operations. The district court addressed that issue, and it is neither before us on appeal nor relevant to any question that is. Therefore, we need not address these arguments.

### C. Section 7.1 vs. Section 9.1

Having concluded that Section 7.2 is inapplicable, the remaining question is whether Section 7.1 or Section 9.1 applies. The former would make Menzies responsible for floor repairs, while the latter renders CenterPoint responsible for "damage." The district court found these sections "apparently inconsistent," but reasoned that the more specific provision (Section 7.1) prevailed over the more general one (Section 9.1). Because Section 7.1 left Menzies responsible, Menzies could not prevail in its suit.

We agree with the district court's analysis. As noted, the more specific provision of a contract governs where it arguably conflicts with a more general provision. *Grevas*, 152 Ill. 2d at 411. As we have explained, where one provision is general enough to include the specific situation to which the other is confined, "the specific provision will be deemed to

qualify the more general one, that is, to state an exception to it." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. NLRB*, 544 F.3d 841, 859 n.10 (7th Cir. 2008). Menzies embraces this principle, but argues that Section 9.1 is actually the more specific provision. This argument is unconvincing, however. Section 9.1 refers generally to damage or destruction. By contrast, Section 7.1 refers to thirty specific parts of the warehouse that Menzies is responsible for maintaining and repairing.[3] Looking to neighboring sections of the lease only strengthens this reading: whereas Section 9.2 refers generally to the "total or partial demise" of the warehouse, Section 7.2 refers specifically to CenterPoint's responsibility to maintain and repair the roof, exterior walls, and foundation. *See Baker v. Am.'s Mortg. Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995) (term in contract could "be understood only with reference to the context in which it appears") (applying Illinois law).

Menzies argues that CenterPoint should pay for the "damage" to the concrete slab, and in making this argument,

---

[3]Section 7.1 states in relevant part: "Except as set forth in Section 7.2, Tenant shall, at its sole cost and expense, promptly perform all maintenance and promptly make all necessary repairs and replacements, ordinary as well as extraordinary, foreseen as well as unforeseen, in and to the Premises and any equipment now or hereafter located in the Premises, including, but not limited to, all floors, floor coverings, windows, glass, plate glass, ceilings, skylights, interior and demising walls, doors, electrical systems, lighting fixtures and equipment, plumbing systems and fixture, sprinkler systems, heating, ventilating and air conditioning systems, loading docks, areas and doors, rail space areas, fences and signs, connections, pipes, mains, water, sewer and connections, and all other fixtures, machinery, apparatus, equipment and appurtenances now or hereafter belonging to, connected with or used in conjunction with the Premises."

Menzies seeks to draw upon the meaning of "damage" in *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 667 (7th Cir. 2008). But Menzies' interpretation would have the effect of reading several provisions out of the lease entirely. At a minimum, it would render meaningless Sections 7.1 and 34.15,[4] because CenterPoint would need to repair "damage," even if Menzies was specifically responsible for that part of the warehouse (like the floor). If it is possible to give effect to "each clause and word" of the contract, we must do so. *Hufford*, 113 Ill. 2d at 172. In this case, another reading is possible, whereby every section retains significant meaning.

Namely, Section 9.1 provides that CenterPoint is responsible if any Improvements are "damaged or destroyed, in whole or in part." Section 9.2 refers to "a total or partial demise," and makes CenterPoint responsible for rebuilding a like building. Demise means to "die." MERRIAM-WEBSTER DICTIONARY ONLINE, available at http:// merriam-webster.com/dictionary (last visited December 19, 2013). The coupling of Sections 9.1 and 9.2 suggests that they concern severe damage—the partial or total *destruction* of the warehouse (e.g., the type of damage one associates with a tornado), not just damage to an aspect of the building (e.g., a door or the floor). Admittedly, Section 9.1 says "damaged or destroyed, in whole or *in part*." (emphasis added). We

---

[4]Section 34.15 states: "This Lease shall be deemed and construed to be a 'net lease' and Tenant agrees to pay all costs and expenses of every kind and nature whatsoever, ordinary and extraordinary, arising out of or in connection with the ownership, maintenance, repair, replacement, use and occupancy of the Premises during the Term of this Lease, which, except for the execution and delivery hereof, would otherwise have been payable by Landlord."

acknowledge that our reading is not the only one possible, but it gives effect to the parties' terms in the sections at issue in this case, as well as to their contract as a whole. Our interpretation also accords with precedent by preserving independent meaning for each part of the contract. Under our reading, Menzies is responsible for the floor damage in this case, under Section 7.1; CenterPoint is responsible for damage to the outer shell of the building, under Section 7.2; and CenterPoint is also responsible if the building is destroyed or severely damaged, under Section 9.1. (We note that damage can be severe and partial simultaneously; a tornado could tear off the roof and lead to significant damage, even though the structure remained mostly intact.)

Menzies next contends that "ambiguous language is not sufficient to assign away the landlord's responsibility for structural repairs." Under Illinois law, landlords are presumed to be responsible for "structural" repairs to a building, and contract provisions that shift such responsibility to tenants must be plainly discernable. *See Kaufman v. Shoe Corp. of Am.*, 24 Ill. App. 2d 431, 436 (1960). The district court found that this lease "plainly states that the default repair and replacement responsibility lies with the tenant," and we agree. *Cf. Rexam Bev. Can Co. v. Bolger*, 620 F.3d 718, 726 (7th Cir. 2010). The fact that this lease contains certain ambiguities does not negate the fact that it plainly shifts repair responsibility to Menzies. Under the lease, Menzies expressly "assumes full and sole responsibility for the condition, operation, repair, alteration, improvement, replacement, maintenance and management of the Premises," subject to specific exceptions in Section 7.2. Menzies' obligations extend to "extraordinary" and "unforeseen" repairs and replacements as well. Accordingly,

the district court's interpretation is not clearly erroneous on this record.

Menzies also argues that in situations of ambiguity, the lease must be construed "most strongly" against the landlord. *NutraSweet Co. v. Am. Nat. Bank & Trust Co. of Chi.*, 262 Ill. App. 3d 688, 695 (1994). However, subsequent cases suggest that this "anti-drafter" rule of construction is (1) a rule of "last resort," *Alberto-Culver Co. v. Aon Corp.*, 351 Ill. App. 3d 123, 132 (2004), and (2) has no application where two sophisticated business entities both participated in drafting the agreement, *id.* In this case, the parties expressly agreed in Section 34.8 of the lease that preparing the lease was "a joint effort of the parties" and the resulting lease should not "be construed more severely against one of the parties than the other." For these reasons, Menzies' argument is unconvincing.

Finally, Menzies contends that the parties' insurance obligations support its interpretation. Menzies notes that, under Article 8 of the lease, CenterPoint must maintain insurance on all Improvements for all risks of direct physical loss, while Menzies is not required to maintain such insurance, although it is required to have insurance for various other risks. As a result, Menzies claims that the district court's interpretation "unfairly imposes on Menzies an uninsured risk of loss." *See Alliance to End Repression v. City of Chi.*, 742 F.2d 1007, 1013 (7th Cir. 1984) (en banc) ("Suppose that the result of reading a contract in a particular way is that one of the parties assumed enormous risks and got nothing in return; this would argue against the reading."). CenterPoint replies that we should read Articles 7, 8, and 9 together, which is sensible because we interpret

the contract as a whole. *Gallagher*, 226 Ill. 2d at 233. And Section 9.2, entitled "Insurance Deductible," discusses insurance "[i]n the event of either a total or partial demise of the Improvements." This section informs our reading of the neighboring provisions and supports the interpretation suggested above, under which CenterPoint is responsible for—and insured for—severe damage. Accordingly, we are unpersuaded by Menzies' insurance-related contention.

We therefore conclude that the specific provision that makes Menzies responsible for repairing or replacing the floor, Section 7.1, prevails over the general provision that makes CenterPoint responsible for rebuilding if there is damage or destruction, Section 9.1.

### III. Conclusion

For the foregoing reasons, we AFFIRM.