In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-1794

CAROLE CHENEY,

*Plaintiff-Appellee,*

*v.*

STANDARD INSURANCE COMPANY and LONG TERM DISABILITY INSURANCE,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 4269 — **Susan E. Cox**, *Magistrate Judge.*

ARGUED JANUARY 20, 2016 — DECIDED JULY 27, 2016

Before WOOD, *Chief Judge,* and MANION and ROVNER, *Circuit Judges.*

WOOD, *Chief Judge.* Carole Cheney was an attorney at Kirkland & Ellis, LLP (Kirkland) for approximately 20 years. She became a partner at the firm in 1997. She suffered from a spinal disease that first led her to seek accommodations in 1994, and ultimately resulted in a three-level anterior cervical

discectomy and fusion and removal of her C5 vertebra in 2012.

Although Cheney had managed to work for many years despite her condition, by 2012 she had had enough, and so she submitted a claim for long-term disability benefits in July 2012. Standard Insurance Company ("Standard")[1], Kirkland's insurer, denied her claim based on a finding that her coverage had ended in March of 2012, and that she was able at least through March to perform her job. (Although Standard's initial denial used the March date, it never made that argument to the court and was thus not judicially estopped from arguing later, as it did, that coverage ended in December 2011.) After Standard refused to reconsider its position, Cheney sued in federal district court, raising claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132. The parties consented to the jurisdiction of the magistrate judge, 28 U.S.C. § 636(c), and agreed to a trial based on the stipulated paper record. The court found in favor of Cheney, and Standard appeals. Because the district court made unsupported factual findings and misinterpreted the governing documents, we vacate its decision and remand for a new trial.

# I

## A

Cheney began working at Kirkland in 1991. In 1994, she requested ergonomic accommodations to mitigate neck and

---

[1] The arguments focus on Standard, which administered the Long Term Disability Plan. No one has argued that there is any legal difference between the two, and we refer to the defendants throughout as "Standard."

lower back pain. Kirkland obliged. In 2003, she received permission to work mostly from home. She also began attending physical therapy and saw multiple orthopedic and chiropractic doctors. She was diagnosed in 2007 with degenerative disease of her cervical spine. For the first four months of 2010, Cheney's pay was based on a 21-hour work week. In May of 2010, Kirkland sent her a letter confirming that she would be paid hourly, with no minimum required hours, until February 2011. But for the remainder of 2010, she did almost no legal work for the firm. Instead, from May to November 2010, Cheney campaigned for election as the DuPage County Board Chairman. Kirkland paid her nothing from May to October; in November, she worked seven hours; in December, she worked 17. In early 2011 Cheney returned to work at approximately 24 hours per week. But the political bug bit again, and so in September 2011 she announced her campaign for the Illinois House of Representatives. Her last hours were logged on December 19, 2011. She lost the primary on March 20, 2012.

In the meantime, Cheney's condition was deteriorating gradually. Scans taken in November and December 2011 showed degeneration and mild to moderate cervical and central spinal stenosis. Cheney's physician, Dr. Staci Ahrens, reported that Cheney suffered a fall that exacerbated her pain in early October 2011. On October 25, Cheney indicated that she was feeling better. On November 15, Dr. Ahrens noted that Cheney "reports sitting and using the computer have been extremely bothersome … . She has experienced this issue for years, so she is extremely frustrated, as it does inhibit her ability to perform her job and disrupts her every ADL [activity of daily life] once exacerbated." On November 18, Dr. Ahrens noted that Cheney had to discontinue doing paper-

work because of her pain. On December 19, Dr. Ahrens reported that Cheney was "doing better and attempting to take frequent breaks" but that her neck pain was aggravated by carrying Christmas lights.

In November 2011, Cheney initiated a conversation with Kirkland about taking a six-month leave of absence. The firm approved a leave, which was to begin on January 3, 2012, and last until July of 2012. Her last day of work, however, was December 19, 2011. We will have more to say about the status of the two-week period between December 19 and January 3; it is enough for now to say that it is unclear.

On April 17, 2012, Cheney met with a neurosurgeon, who advised her to complete a twelve-week intensive physical therapy program and receive cervical epidural injection therapy. After the twelve-week program failed to improve Cheney's condition, the neurosurgeon recommended cervical spinal fusion surgery, which Cheney received on August 27. Cheney submitted her claim for long-term disability benefits to Standard on July 17, just before the surgery.

## B

The long-term disability policy Kirkland offered to its lawyers through Standard covers the "Member," a term defined by the policy's "Becoming Insured" and "General Policy Information" sections. Those sections describe "the Member" as a "regular employee" who is "Actively at Work at least 60% of the Employer's full time schedule" or "A partner of the Employer who is Actively At Work for the Employer." The policy defines "Active Work and Actively At Work" as "performing with reasonable continuity the Material Duties of your Own Occupation at your Employer's usual place of business." The

policy also states that "Actively At Work [includes] regularly scheduled days off, holidays, or vacation days, so long as the person is capable of Active Work on those days."

An employee must complete an "eligibility waiting period" before she is entitled to benefits. The policy states that an employee becomes eligible on the later of the Group Policy Effective Date—in this case January 1, 2008—or the date the employee becomes a Member. Once an employee is covered, if she "become[s] disabled while insured under the Group Policy, [Standard] will pay [long-term disability] Benefits" after receiving satisfactory proof of loss.

The policy's termination provision reads, in relevant part:

Your insurance ends automatically on the earliest of:
1. The date the last period ends for which a premium contribution was made for your insurance.
2. The date the Group Policy terminates.
3. The date your employment terminates.
4. The day you cease to be a Member. However, your insurance will be continued during the following periods when you are absent from Active Work, unless it ends under any of the above.
  a. During the first 90 days of a temporary or indefinite administrative or involuntary leave of absence or sick leave, provided your Employer is paying you at least the same Predisability Earnings paid to you immediately before you ceased to be a Member. …
  b. …
  c. During any other temporary leave of absence ap-

proved by your Employer in advance and in writ-
ing and scheduled to last 9 months or less. A period
of Disability is not a leave of absence.
d. During the Benefit Waiting Period.

Finally, the policy defines disability as follows: "You are
Disabled from your Own Occupation if, as a result of Physical
Disease, Injury, Pregnancy or Mental Disorder, you are una-
ble to perform with reasonable continuity the Material Duties
of your Own Occupation." "Own Occupation" is defined as
employment "of the same general character as the occupation
you are regularly performing for your Employer when Disa-
bility begins." The policy also states that if your Own Occu-
pation necessitates a professional or occupational license, the
scope of your Own Occupation is "as broad as the scope of
your license." "Material Duties" are defined as "the essential
tasks, functions and operations, and the skills, abilities,
knowledge, training and experience, generally required by
employers from those engaged in a particular occupation that
cannot be reasonably modified or omitted."

The policy establishes a Benefit Waiting Period of 180
days, meaning that a Member must remain disabled from
working for that time in order to qualify for benefits. Benefits
begin after 180 days of disability. Predisability Earnings are
calculated for firm partners based on the prior tax year.

C

The district court found that Cheney was covered under
the policy through September 2012, nine months after she be-
gan her temporary leave, even though her leave was to last
only six months. The court considered it "reasonable to as-
sume" that during the period between December 19 and

when Cheney's leave began on January 3rd, she was either using sick days or taking vacation days that may not have been officially documented. Because a Member is considered "Actively at Work" while taking holiday or vacation days, so long as she is capable of work at that time, the court concluded that Cheney's coverage did not end on December 19, 2011, despite the language in paragraph 3 of the Termination provision. The court also ruled that the leave commencing on January 3, 2012, was not a "period of Disability," but instead was a regular temporary leave of absence scheduled to last nine months or less. Had it been a period of disability, it would have triggered the end of Cheney's coverage under paragraph 4.c. With those hurdles cleared, the court determined that Cheney was eligible for long-term disability benefits because her condition prevented her from fulfilling the obligations of a litigation partner.

## II

We review challenges to ERISA benefit determinations *de novo* where, as here, the benefit plan does not grant discretionary authority to the plan fiduciary. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). We evaluate the question whether Policy terms are ambiguous *de novo. Aeroground, Inc. v. CenterPoint Props. Trust*, 738 F.3d 810, 813 (7th Cir. 2013). Ambiguous contract terms are construed in favor of the insured. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). We review factual findings by the district court for clear error. *Ray v. Clements*, 700 F.3d 993, 1012–13 (7th Cir. 2012). Finally, we apply federal common law to interpret the policy terms and "draw[] on general principles of contract in-

terpretation, at least to the extent that those principles are consistent with ERISA." *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012).

Standard argues that the district court erred when it found that the policy covered Cheney past December 19 and in defining her occupation too narrowly. Additionally, Standard takes issue with the district court's calculation of Cheney's Predisability Earnings. Cheney responds that Standard's appeal cannot go forward, because it did not file a motion under Federal Rule of Civil Procedure 52(b) requesting more specific findings of fact. There is no such requirement for appeal, however, and so we are free to proceed to the merits.

## A

To be entitled to benefits, Cheney must demonstrate that she was covered by the policy when she became disabled. Although Cheney's last work hours of any kind (these happened to be billable) were recorded on December 19, the fact that she was on payroll until January 3, 2012, and her leave of absence did not expire until July 2012, muddies the answer to the question of her last date of coverage.

The use of the term "leave" is normally reserved for absences taken by existing employees, and so one might think that it implies that Cheney was an employee at least until July 2012. But the policy did not condition coverage exclusively on a person's status as an employee. Instead, it listed at least two different bases for the end of coverage: the termination of employment (paragraph 3); and the date the employee ceases to be a Member (paragraph 4). Being a Member requires "Active Work." This indicates that there are some people who are no longer working actively (as defined in the policy) but whose

employment has not yet been terminated, who have lost coverage. If employment termination were always required, paragraph 4 would be empty. Applied here, even if Cheney did not lose her coverage under paragraph 3 (because she was still being paid until her leave expired), she was no longer engaged in "Active Work" as of December 20, 2011, and thus had to qualify under one of the exceptions in the subparts of paragraph 4.

The district court's first problematic ruling was its determination that Cheney's last day of "Active Work" was January 2, 2012, not December 19, 2011. The court picked January 2 because that was the start of the "temporary leave of absence approved" by Kirkland. The district court reached that conclusion by noting that "[i]t [would be] a stretch to claim that plaintiff, a lawyer with Kirkland for twenty years, immediately ceased being a 'Member' two weeks before her scheduled leave of absence simply because this is the date she indicated as her last day of work prior to her leave." It acknowledged that Cheney had not explained the two-week gap until her motion for entry of judgment, but found that while no evidence supported the claim that she was using vacation and sick days, "there [was] nothing in the record to dispute it."

There are several problems with the court's conclusion that Cheney was using vacation or sick days to fill the gap. We do not, however, rely on any alleged admission based on Cheney's statement in the complaint that she "successfully held the position of Partner Attorney specializing in appellate litigation at Kirkland & Ellis LLP where she worked until December 19, 2011, at which point she received approval for a previously sought six-month leave of absence." Stating that she "worked until December 19" is not the same as stating

that her employment terminated on that date or that she ceased to be a Member on that date. But there are ample additional reasons to set aside this part of the district court's decision.

First, the court should not have resolved doubts or gaps in the evidence in Cheney's favor, because she had the burden to demonstrate policy coverage. See *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005) (employee seeking to enforce benefits bears burden of demonstrating entitlement).

Second, the policy states that for purposes of the definition of Member, Active Work includes "regularly scheduled days off, holidays, or vacation days, *so long as the person is capable of Active Work on those days*." (Emphasis added.) This clause suggests that if someone is on vacation or sick time, but unable to work because of a disability, he is not "Actively at Work." An employee may remain covered, even if not "Actively at Work," for the first 90 days of administrative, involuntary, or sick leave; or during a scheduled *non-disability* pre-approved temporary leave. Because Cheney claims disability from December 20 onward, she could not have been "capable of Active Work" between December 20 and her January leave. Neither did that two-week period count as the first 90 days of a leave or a 9-month or less scheduled leave. Had Cheney's scheduled leave begun on December 20 instead of January 3rd, perhaps she would have a better argument. But it did not, and the district court erred in finding that her coverage extended based on the stipulated record.

The district court opined that the "Active Work" language applied only to when the insurance *becomes* effective, not when it ends. But no such distinction can be found in the plain language of paragraph 4, which states that coverage ends

when a person ceases to be a Member, unless she is absent from Active Work for one of the enumerated reasons.

Even if, counterfactually, Cheney's leave had begun on December 20 and there were no two-week gap to deal with, the problem of her leave remains. The policy contains no exception to termination of coverage for a temporary leave for disability. If Cheney was covered until the day her leave began, she still would not be covered during her leave if it was a disability leave. The district court worked around this difficulty by finding that because Cheney did not request her leave "under the auspices of 'sick leave,'" the leave did not formally constitute "sick leave" and did not end coverage. It did not grapple with the policy's explicit carve-out for disability leave. Neither did Cheney, in her brief in this court, address whether her leave of absence was "a period of Disability." She has put herself in a bind by simultaneously claiming disability and that the resulting leave was not a disability leave. The policy may offer poor coverage to people with a chronic, gradually developing disability, but the propriety of that failing is not the question before us. Nothing in ERISA required Standard or Kirkland to write a different policy—a fact that Cheney appears to acknowledge.

Cheney also relies on a case where we held that there is no inherent incompatibility between working full time and being disabled from working full time. *Hawkins v. First Union*, 326 F.3d 914, 918 (7th Cir. 2003). But Standard did not deny Cheney's claim based on her working while claiming disability. Cheney was not working at all after December 19, and so *Hawkins* is inapposite.

The district court impermissibly stretched Cheney's policy coverage by ignoring certain provisions and making conclusions of fact without supporting evidence. Standard asks for a new trial, which is fully warranted on this ground.

B

The district court made no explicit finding about the onset date of Cheney's long-term disability. Instead, it inferred that her disability began sometime between December 19, 2011, and September 3, 2012, and lasted for at least the 180-day benefit-waiting period. Given the court's misinterpretation of the coverage provisions, the specific date of disability may be crucial. If Cheney became disabled from performing her job on December 19 (*i.e.*, while she was still working), it is possible that she would be entitled to benefits under the terms of the policy. If she became disabled later, the stipulated record before us indicates that she would not be so entitled, because her coverage would have ended.

The district court did not nail down exactly when Cheney met the definition of disability. It also asked the wrong question, namely, whether she was capable of working as a litigation partner in a big law firm, stating that "[w]hether plaintiff can find other, less demanding, work as a lawyer is not the question." But the court was wrong: that *was* the question under the policy. It explicitly states that one's occupation, if it requires a license, is "as broad as the scope of [the] license." Because the practice of law requires a license, the issue is whether Cheney can find any work—in the same specialty or another, or generally—as a lawyer. A new trial is also necessary on this point.

The court also erred by finding that an inability to perform one essential job task is sufficient for entitlement to benefits. It relied on our holding in *McFarland v. Gen. Am. Ins. Co.*, 149 F.3d 583 (7th Cir. 1998), but that case did not go so far. In *McFarland*, we found unambiguous an insurance contract that defined "occupational disability" as "[inability] to perform the material and substantial duties of [one's] regular occupation." *Id.* at 585, 587. Under that clause, a person has a total disability "[w]hen the insured cannot perform a sufficient number of his material and substantial duties and is therefore precluded from continuing the employment he undertook before the disability." *Id.* at 587. We explicitly rejected the notion that being unable to perform one task is always sufficient for total disability, unless that task is essential to performing the job, as in the case of a shortstop unable to throw or a barber who lost a hand. *Id.* at 588.

The inability to perform a single material job task does not demonstrate disability within the meaning of this policy. Nothing in the record supported the idea that the act of sitting at a computer or in court is so essential to being a lawyer that there is no way to be a lawyer without performing it. It was not even clear whether Cheney could instead have stood at a computer or in the courtroom to mitigate her pain. The court did briefly note that Cheney had already tried switching from sitting to standing and that this had not helped. But the court's treatment was cursory and not supported by evidence from Cheney's doctors.

Because the district court failed (1) to find when Cheney became disabled, (2) to use as a basis of comparison all work that someone licensed to practice law in Illinois may perform,

and (3) to analyze the medical evidence in the proper light, a new trial is necessary on these bases as well.

C

Standard also takes issue with the district court's calculation of Cheney's Predisability Earnings. The pertinent language in the policy for this point is as follows:

> Your Predisability Earnings will be based on your earnings in effect on your last full day of Active Work. However, if you are a Partner, your Predisability Earnings will be based on your prior tax year. Any subsequent change in your earnings after that last day of Active Work will not affect your Predisability Earnings.

Because Cheney took significant time off in 2010, a "prior tax year" of 2010 would result in much lower benefits than a prior tax year of 2011. The district court asked for additional briefing on calculating Predisability Earnings. The parties agreed, and the court found, the relevant date for determining the "*prior* tax year" to be the date on which Cheney ceased "Active Work." Although Cheney at times listed her last day of work as December 31, 2011, or December 19, 2011, the district court concluded nonetheless that she was "in 'Active Work' status" until her leave began on January 3, 2012. That finding permitted the use of 2011 as the reference year. Along the way, the court found the term "Active Work" to be ambiguous, allowing it to implement an interpretation in Cheney's favor. *Ruttenberg*, 413 F.3d at 665–66.

Once again, we must disagree with the district court's reading of the policy. The term "Active Work" is not ambigu-

ous. It means that an employee is either engaged in performing the material duties of their job, or on regular vacation but capable of performing those duties. The district court made the same mistakes interpreting "Active Work" here as it did in extending Cheney's coverage date. Either Cheney was disabled as of December 20, 2011 (the day after her last work day), and not capable of "Active Work" between December 20 and January 3, meaning that the "prior year" for earnings purposes would be 2010 (a year in which Cheney worked only a few months); or she was on regularly scheduled vacation and capable of "Active Work" from December 20 to January 3, 2012, but not yet disabled. The latter interpretation, at this point, is not one that Cheney's own pleadings support, given her consistent claim of December 20 as the date of the beginning of her disability.

The court also thought that Cheney's "reasonable expectations" of coverage were relevant and appropriate to consider, in light of ERISA's purposes. *Ruttenberg*, 413 F.3d at 668 n.19 (citing Second, Fourth, Sixth, and Ninth Circuit precedent). No one disputes that "ERISA maintains the basic goal of 'protecting employees' justified expectations of receiving the benefits their employers promise them.'" *Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 819 (7th Cir. 2010) (quoting *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004)) (allowing reformation of plan in favor of the plan because scrivener's error did not actually lead employees to expect greater benefits). But the reasonable-expectation doctrine is related to actual reliance by the employee. We can find no evidence here from which the district court could have concluded that Cheney had an expectation, let alone relied on an expectation, of receiving disability benefits based on her 2010 earnings.

We do note, however, that where a person was a partner for only part of her prior tax year, Predisability Earnings under the policy are calculated based only on months during which she was a partner. It may be possible to argue—although the policy does not address the proper calculation of benefits from a prior tax year in which the employee had a substantial period of unpaid leave—that the policy would apply in the same manner, calculating earnings only from the months during which the person was actually being paid. Because Cheney was a non-equity partner, she received no income at all during her 2010 leave, which began in May of that year. This principle would enable her to exclude the months of leave and calculate a more representative monthly pay.

That point, however, can be taken up on remand. All we can say at this juncture is that the district court's calculation of Predisability Earnings based on the year 2011 is not tenable. Should the court decide after a new trial that Cheney is eligible for long-term disability benefits, it will need to take a fresh look at Cheney's Predisability Earnings in accordance with the principles we have discussed here.

### III

Because the district court erred in interpreting the policy and made factual findings unsupported by the record evidence, we VACATE the district court's judgment and REMAND for proceedings consistent with this opinion.