JEFFREY KALETA *et al.*, Plaintiffs-Appellants, v. WHITTAKER CORPO-RATION *et al.*, Defendants-Appellees.—JEFFREY KALETA *et al.*, Plaintiffs-Appellants, v. TUG MANUFACTURING CORPORATION, Defendant-Appellee.

First District (1st Division)   Nos. 1—89—1340, 1—90—0005 cons.

Opinion filed September 23, 1991.—Rehearing denied December 2, 1991.

David J. DeJong & Associates, Ltd., of Chicago (David J. DeJong and John J. O'Leary, of counsel), for appellants.

Lapin, Hoff, Spangler & Greenberg, of Chicago (John Scott Hoff, of counsel), for appellees.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

In appeal No. 1—89—1340, plaintiffs, Jeffrey Kaleta (hereafter Jeffrey or plaintiff) and his wife, Lisa Kaleta, brought an action against several corporations, not a part of this appeal, Whittaker Corporation (hereafter Whittaker or defendant) and its wholly owned subsidiary, Cochran Systems, Inc. (hereafter Cochran Systems or defendant). In their fourth amended complaint, plaintiffs allege that defendants are the corporate successor of Cochran Airport Systems (hereafter Cochran Airport), the original manufacturer of a defective beltloader that caused Jeffrey's injuries, and seek recovery based upon the theories of strict product liability, breach of warranty and negligence. Following several hearings, the trial court granted summary judgment in favor of defendants.

The issues on this appeal are whether Whittaker or its subsidiary, Cochran Systems, is liable to plaintiffs as the successor corporations of manufacturer, Cochran Airport, and whether Whittaker expressly assumed liability for Cochran Airport pursuant to the sales agreement. The pertinent facts follow.

On September 12, 1985, Jeffrey, a baggage loader for American Airlines at O'Hare field, was inside the baggage hold of an American Airlines jetliner unloading baggage that was being transported up from the ground level by a beltloader when the front end of the conveyor of the mobile beltloader fell on his legs. He was severely injured with near fatal crush injuries to both legs that resulted in amputation of the right leg below the knee and permanent nerve and muscle damage to the left leg. A mobile beltloader is a piece of motorized ground equipment that has a conveyor belt which can be raised up to the level of the jet aircraft baggage hold.

The beltloader, serial number 660-316 (referred to as a cargoveyor by defendants), was manufactured by Cochran Airport in December 1979 in its Peachtree, Georgia, facility and sold to American Airlines on January 21, 1980.[1] Almost two years later, on December 16, 1981, Tug Manufacturing Corporation purchased the entire 660 beltloader product line from Cochran Airport. Thereafter, Cochran Airport continued its production of other aviation-related products until October 28, 1983, when it sold its remaining assets to Whittaker pursuant to

---

[1]Although the sale occurred in January 1980, Cochran Airport did not ship the beltloader to American Airlines until December 31, 1981.

an agreement of purchase and sale of assets (hereafter Agreement). The sale of assets did not include the 660 beltloader product line or the subject beltloader involved in this incident. Thereafter Whittaker transferred all of the Cochran Airport assets to Whittaker Holdings Corporation, a wholly owned subsidiary, and the subsidiary changed its name to Cochran Systems, Inc., on November 8, 1983. Cochran Airport, the predecessor corporation, then executed articles of dissolution on December 1, 1983, and filed them on December 31, 1983. Also commencing October 28, 1983, Whittaker employed Mr. Joseph Cochran as the president of Cochran Systems for a period of 15 months pursuant to an employment agreement. Joseph Cochran was the president and majority shareholder of Cochran Airport and negotiated the sale of assets to Whittaker.

In their suit, plaintiffs asserted that Whittaker and Cochran Systems were liable for the torts of Cochran Airport either on the theory of a *de facto* merger of the corporations or on the basis of Whittaker's express assumption of liability pursuant to the Agreement. Defendants moved for summary judgment, arguing that plaintiffs had failed to establish all of the requirements for proof of a *de facto* merger and that defendants had not expressly assumed any liabilities of Cochran Airport other than the liabilities specifically set forth in the Agreement. In support of their respective contentions on the summary judgment motion, the parties filed several memoranda, affidavits of company officials, documents and exhibits.

On January 23, 1989, the trial court found: (1) that "there was a sale of assets from CAS, Inc. (Cochran Airport) to Whittaker and its subsidiary"; (2) that "there was no continuity of ownership or successor liability from CAS, Inc. to either Whittaker or any subsidiary, including Cochran Systems, Inc."; and (3) that "there was no express assumption of liability of CAS, Inc. by Whittaker, other than set out in the Asset Sale Agreement dated 28 Oct. 1983." Following the trial court's denial of their motion for reconsideration of the summary judgment order, plaintiffs filed a timely notice of appeal to this court.

■ In Illinois, the general rule is that a corporation that merges with another corporation takes on the latter corporation's obligations and liabilities while a corporation which merely purchases the assets of another corporation is not liable for the debts and obligations of the transferor corporation (*Manh Hung Nguyen v. Johnson Machine & Press Corp.* (1982), 104 Ill. App. 3d 1141, 1143, 1148, 433 N.E.2d 1104; *Domine v. Fulton Iron Works* (1979), 76 Ill. App. 3d 253, 256, 395 N.E.2d 22), in the absence of an agreement providing otherwise. (*Hernandez v. Johnson Press Corp.* (1979), 70 Ill. App. 3d 664, 388

N.E.2d 778.) However, this rule is not without limitation as it is also well established under what circumstances a corporation that purchases the assets of another corporation will be held liable for the transferor corporation. In *Hernandez v. Johnson Press* (70 Ill. App. 3d at 667), this court delineates the "several recognized exceptions:

> (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations.

[Citations.] Exception (2) is recognized in Illinois [citation], and has been interpreted to include a *de facto* merger. [Citation.]" Like in *Hernandez*, plaintiffs here assert the existence of a *de facto* merger.

■ The criterion for establishing the existence of a *de facto* merger is identified in *Hernandez* and reiterated in *Nguyen*. A *de facto* merger may occur when the following factors are present:

> (1) there is a continuity of the business enterprise between seller and buyer, including continuity of management, employees, location, general business operations and assets;
>
> (2) there is a continuity of shareholders, in that shareholders of the seller become shareholders of the buyer so that they become a constituent part of the buyer corporation;
>
> (3) the seller ceases operations and dissolves as soon as possible after the transaction; and
>
> (4) the buyer assumes those liabilities and obligations necessary for the uninterrupted continuation of the seller's business.

*Nguyen*, 104 Ill. App. 3d at 1143; *Hernandez*, 70 Ill. App. 3d at 667.

■ In the present case, the record does not reflect that there was a continuity of management, directors or shareholders of the two corporations with the exception of Cochran. The trial court concluded that while the other three requirements of the *de facto* merger test might present issues of fact, a jury could not as a matter of law have found continuity of shareholder, so as to meet the "merger exception" to the general rule on nonliability. We agree. No continuity of shareholders resulted from Whittaker paying for the acquired assets of Cochran Airport with shares of its stock. The purchase was for cash in the amount of $290,000 rather than shares of stock in the new corporation. Although Cochran received 74 shares of Whittaker stock, the record demonstrates that the amount was *de minimus* as it represented only .00037% of Whittaker's stock. Additionally, he received the stock pursuant to an employee stock plan which was available to

all employees. The stock was worth $1,200. Thus, we believe that the Whittaker stock was received by Cochran as consideration for services as an employee rather than as an element of consideration of the asset sale.

In *Nguyen*, this court determined that continuity of shareholders is probably the most important element and concluded that "without continuity of shareholders, it does not appear just to require the successor corporation to assume the liabilities of the predecessor when it has already paid a substantial price for the assets of the predecessor." (*Nguyen*, 104 Ill. App. 3d at 1149.) Since the factor of continuity of shareholders is absent, we agree with the trial court's disposition that no *de facto* merger transpired between Whittaker or Cochran Systems and Cochran Airport.

Furthermore, Whittaker's purchase of the Cochran Airport assets did not include the beltloader line of products or the subject beltloader involved in Jeffrey's accident. Such products and product line had been sold to Tug approximately two years prior to the Agreement.

Plaintiffs next assert that Whittaker expressly agreed to assume all of Cochran Airport's liabilities that arose after the date of the Agreement. In support of this argument, plaintiffs rely on Cochran's testimony given during his deposition and the language in Paragraph 10(d) of the Agreement. Plaintiffs allege that during the deposition Cochran stated that his intention and understanding of the Agreement were that Whittaker was to assume all liability for any product liability claims of Cochran Airport which accrued after the sale of the assets or the date of the Agreement.

Paragraph 10(d) provides that seller and Cochran were to indemnify Whittaker for:

> "Any claims against, or liabilities or obligations of Seller (Cochran Airport) or Cochran (Mr. Joseph Cochran) not specifically assumed by Buyer (Whittaker) pursuant to this Agreement including, without limitation, claims for products liability in connection with the Products manufactured prior to the Closing Date (October 28, 1983) and claims arising from the exceptions to Seller's and Cochran's representations noted on Schedule 3; provided, however, that Cochran's obligation to indemnify Buyer for products liability shall be limited to claims arising out of occurrences which precede the date of this Agreement."

Plaintiffs urge that because the language of paragraph 10(d) provides that both Cochran and Cochran Airport were to indemnify Whittaker for claims which were in existence prior to the Agreement, there exists an implication, or question of fact, as to whether Whittaker was

to assume liability for those claims arising after the date of the Agreement.

■■ We have reviewed the Agreement in general and paragraph 10(d) in particular. Plaintiffs' interpretation of the indemnification clause is without merit. We found no agreement on the part of Whittaker to assume the general liabilities and obligations of Cochran Airport. Further, we discovered that the limiting language of the indemnification clause with respect to products liability claims refers to Cochran alone, and not both Cochran and Cochran Airport.

Moreover, the Agreement contains an express disclaimer clause releasing Whittaker of any and all liabilities of Cochran Airport arising from the purchased assets or the operation of Cochran Airport. (Accord *Climatrol Industries, Inc. v. Fedders Corp.* (1986), 149 Ill. App. 3d 533, 501 N.E.2d 292.) In relevant part, paragraph 3 states that Whittaker "does not assume and shall not be responsible for any obligations or liabilities of Seller or Cochran whatsoever." We discerned that Whitaker expressly agreed to assume four very limited and specific obligations, none of which, however, included any liability for the incident involving plaintiffs.

We conclude that the trial court's finding that there was no express assumption of liability on the part of Whittaker other than the liabilities it accepted as specifically set forth in the Agreement was correct. Even though Cochran gave his interpretation of paragraph 10(d), the record reflects that such interpretation was made without the benefit of counsel, made out of context, and made without the benefit of mention or reconciliation with the disclaimer of liability clause contained in paragraph 3.

We hold that summary judgment is proper where, notwithstanding Cochran's deposition testimony, the language of the Agreement is clear on its face. Summary judgment will be affirmed whenever the facts in the record support the decision of the trial court. *Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 414 N.E.2d 1218.

Accordingly, we affirm the judgment of the circuit court in appeal No. 1—89—1340.

■■ In the complaint in appeal 1—90—0005, plaintiffs sued Tug Manufacturing Corporation (hereafter Tug or defendant) alleging that Tug was liable for Jeffrey's injuries on the grounds that (1) Tug acquired and maintained the product line of Cochran Airport and (2) Tug breached its duty to warn of defects in its predecessor's products. Plaintiffs' first contention is based upon the "product line" approach to successor liability as set forth in the California case of *Ray v. Alad*

*Corp.* (1977), 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574, and as adopted in other State cases. (See *Turner v. Bituminous Casualty Co.* (1976), 397 Mich. 406, 244 N.W.2d 873; *Ramirez v. Amsted Industries, Inc.* (1981), 86 N.J. 332, 431 A.2d 811.) Based upon our research, we found that in Illinois in *Nguyen* (104 Ill. App. 3d 1141, 433 N.E.2d 1104), this court declined to address the specific issue and rejected the analyses and results of the other States which did recognize the "product line" approach. Similarly in *Gonzalez v. Rock Wool Engineering & Equipment Co.* (1983), 117 Ill. App. 3d 435, 453 N.E.2d 792, we affirmed the dismissal of plaintiff's fourth amended complaint and refused to adopt the product line exception to the general rule of nonliability of a purchaser of assets as set forth in *Ray*.

In *Ray* the manufacturer of the ladder on which the plaintiff was injured, Alad I, sold its assets, trade name and goodwill to Alad II. Approximately nine months later, plaintiff was injured and sued Alad II. Alad II had continued to manufacture the same line of ladders under the same name, used the same equipment and personnel, and solicited its predecessor's customers through the same sales representatives. In reversing the trial court's grant of summary judgment on behalf of Alad II, the California Supreme Court held that a transferee which continues a product line is subject to strict liability for defective units of the same line which was manufactured and distributed by the transferor. Although the *Ray* court could find no basis for imposing liability on defendant under traditional exceptions, it relied upon policy considerations. Those considerations are: (1) the nonavailability of plaintiff's remedies against the original manufacturer due to the acquisition of the business by the successor; (2) the successor's ability to assume the original manufacturer's risk-spreading rule; and (3) the fairness involved in requiring the successor to bear the burden for any defects as a consequence of the successor's use of the original manufacturer's goodwill in continuing the product line.

In *Turner* plaintiff was injured by a power press manufactured by a New York corporation. Several years prior to the injury, the New York corporation had sold for cash its entire business, goodwill, name and assets to Harris Corporation. The court decided it was insignificant that the corporate transfer was for cash and not stock and held that there may be a cause of action against the corporate successor "where the totality of the transaction demonstrates a basic continuity of the enterprise." (*Turner*, 397 Mich. at 411, 244 N.W.2d at 875.) However, an additional factor in *Turner* was that the purchaser corporation agreed to assume the liabilities of the seller corporation while defendant here made no such agreement.

In *Ramirez,* the New Jersey court relied upon the same principles as the *Turner* court. However, it rejected the result reached in *Turner* and instead held that liability could be imposed on the successor as long as the successor continued to manufacture and sell the same product as the predecessor, and *Ramirez* expressly adopted the California court's decision in *Ray.*

We have thoroughly reviewed the cases relied upon by both plaintiff and defendant. Although the *Ray, Turner* and *Ramirez* courts found liability despite the successor corporation's lack of or minimal involvement with the product, our research reveals that the doctrine, often referred to as the "product line" approach to successor liability, has been repeatedly rejected by Illinois courts for several legal reasons and policy considerations. See *Gonzalez,* 117 Ill. App. 3d 435, 453 N.E.2d 752; *Nguyen,* 104 Ill. App. 3d 1141, 433 N.E.2d 1104; *Domine,* 76 Ill. App. 3d 253, 395 N.E.2d 22; *Hernandez,* 70 Ill. App. 3d 664, 388 N.E.2d 778; *Johnson v. Marshall & Huschart Machinery Co.* (1978), 66 Ill. App. 3d 766, 384 N.E.2d 141.

In *Johnson* this court directly addressed the *Ray* rule. In addressing the issue of whether a successor corporation may be held amenable to a suit based on strict liability for the torts of its predecessor, this court affirmed the grant of summary judgment in favor of the defendant on the grounds that defendant did not manufacture the press which injured the plaintiff and that it had not agreed to assume liability for tort claims against predecessors. The *Johnson* court stated:

> "The purpose of strict liability in tort is to place the loss caused by defective products on those who create the risk and reap the profit by placing such products in the stream of commerce, regardless of whether the defect was caused by 'negligence' on the part of the manufacturer. [Citation.] The rationale underlying this liability is threefold: (1) the public interest in human life and safety demands broad protection against the sale of defective products; (2) the manufacturer solicits and invites the use of his product by representing that it is safe and suitable for use; and (3) the losses caused by defectively dangerous products should be borne by those who have created the risk and reaped the profit by placing the product into commerce. [Citation.]" (*Johnson,* 66 Ill. App. 3d at 769.)

Thus, the court rejected the rationale of *Ray* and held that under the circumstances presented the defendant did not assume liability for the defective products of its predecessor. In the instant case, similar to *Johnson,* Tug did not manufacture the beltloader which injured

Jeffrey and neither did it agree to assume the liability for the tort claims of Cochran Airport.

In *Domine* this court held that the *Ray* doctrine was not in conformity with the law of strict liability in Illinois because the Illinois Supreme Court had specifically refused to impose strict liability upon a defendant who is outside of the original producing and marketing chain. (*Domine*, 76 Ill. App. 3d at 257, citing *Peterson v. Lou Bachrodt Chevrolet Co.* (1975), 61 Ill. 2d 17, 329 N.E.2d 785.) The court there also opined that the public policy of Illinois does not favor the extension of the doctrine of strict liability to a successor corporation.

In *Hernandez* this court found an additional reason to reject the product line exception in reliance on statements enunciated in *Leannais v. Cincinnati, Inc.* (7th Cir. 1977), 565 F.2d 437. The Court of Appeals for the Seventh Circuit stated:

> "In recent years for a variety of reasons, many have thought it necessary to turn to the courts in search of solutions to social problems. Courts are ill-equipped, however, to balance equities among future plaintiffs and defendants. Such forays can result in wide-ranging ramifications on society, the contemplation of which is precluded by the exigencies of deciding a particular case presented on a limited record developed by present parties. Absent compelling necessity, therefore, a Federal Court should not impose the policy pronouncements of the Supreme Court of one state upon the citizens of another. Nor are we at liberty to impose our own view as to what the law of Wisconsin should be. As the Wisconsin Supreme Court has recognized, such broad public policy issues are best handled by legislatures with their comprehensive machinery for public input and debate." *Leannais*, 565 F.2d at 441.

In *Nguyen*, this court extensively reviewed several hypotheses for creating liability on the part of the successor corporation and rejected each of them. The court concluded that the "arguments offered by plaintiff do not justify imposing the predecessor's potential liability on the successor. *** Perhaps that law should be changed, but the change must come from the legislature." (*Nguyen*, 104 Ill. App. 3d at 1151.) We agree.

As stated in *Green v. Firestone Tire & Rubber Co.* (1984), 122 Ill. App. 3d 204, 460 N.E.2d 895, while the Illinois courts have been struggling with this issue, none have adopted the approach. Accordingly, in light of the recent decisions of this court and because the circumstances here do not mandate a different result, we decline to adopt the "product line" approach to successor liability.

■ Plaintiffs next suggest that Illinois courts will recognize a cause of action for personal injuries against the purchaser of a product line for failing to warn of defects in its predecessor's products. (*Nguyen*, 104 Ill. App. 3d at 1147; *Gonzalez*, 117 Ill. App. 3d 435, 453 N.E.2d 752.) They argue that the trial court improperly and narrowly interpreted Illinois law when it determined that a successor corporation has a duty to warn of defects in a predecessor's product only if the successor has a written service contract covering the particular product and because no such contract exists here, Tug is not liable. In *Gonzalez*, we clarified *Nguyen* by stating that "it is impossible to conceive of such a duty on the part of the successor corporation unless the circumstances following the corporate transfer give rise to the duty" (*Gonzalez*, 117 Ill. App. 3d at 438), *i.e.*, a continuing relationship between the successor corporation and the product manufactured by its predecessor.

In order to determine the presence of a relationship effective to create a duty to warn, the following factors will be considered: (1) succession to a predecessor's service contracts; (2) coverage of the particular machine under a service contract; (3) service of that machine by the purchaser corporation; and (4) a purchaser corporation's knowledge of defects and of the location or owner of that machine. *Gonzalez*, 117 Ill. App. 3d at 438.

The trial court below primarily addressed the issue of lack of service contracts in rejecting plaintiffs' contention that a continuing relationship existed between Tug, American Airlines and the product itself. We find no error by the trial court in ruling on the summary judgment motion on this basis. Our review of the record has found no evidence of a continuing relationship between Tug and American Airlines with respect to servicing of the 660 line of beltloaders. The record reflects that Tug notified American of the obligation it undertook to service the warranty on the product, if any. Although Tug may have told American to relate to it any problems concerning the product, such communications and contacts alone fail to constitute evidence of a continuing relationship between the parties under the *Gonzalez* test. The letter of agreement did not include provisions for either a succession to the service contracts of Cochran Airport or coverage of the particular beltloader in question under a service contract. In fact, the subject beltloader was sold and shipped by Cochran Airport and plaintiffs produced no evidence that the particular machine was ever serviced by Tug. Like *Gonzalez*, in the absence of evidence indicating a continuing relationship between Tug and American Air-

lines, we believe that there is no basis for the imposition of liability upon Tug for breach of a duty to warn.

In our opinion, the trial court properly granted summary judgment in favor of Tug since Tug did not have a written service contract covering the subject beltloader that caused Jeffrey's injuries and Tug did not have any duty to warn of the beltloader's purported defects before an injury occurred. Summary judgment shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005; *Kroll v. Sugar Supply Corp.* (1983), 116 Ill. App. 3d 969, 452 N.E.2d 649.) Accordingly, the judgment of the trial court in appeal No. 1—90—0005 is affirmed.

Based upon our review of the record and in applying the aforementioned principles of law, we conclude that the trial court's grant of summary judgment in favor of defendants in the consolidated appeal is appropriate where, after consideration of all grounds urged and facts raised in the trial court, the moving parties are entitled to judgment as a matter of law.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.