In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1707

TRAD THORNTON, administrator of the ESTATE OF SALLY
URQUHART, deceased, *et al.*,

*Plaintiffs-Appellants*,

*v.*

M7 AEROSPACE LP,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-329 — **Sara L. Ellis**, *Judge.*[*]

ARGUED OCTOBER 27, 2014 — DECIDED AUGUST 6, 2015

No. 14-2481

TRAD THORNTON, administrator of the ESTATE OF SALLY
URQUHART, deceased, *et al.*,

*Plaintiffs-Appellants*,

---

[*]Judge Amy St. Eve was the district court judge for this case at the
time the underlying decision was made. This case has since been reas-
signed to Judge Ellis.

*v.*

JEPPESEN SANDERSON INC. and HONEYWELL INTERNATIONAL
INC.,

*Defendants-Appellees.*

—————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-329 — **Sara L. Ellis**, *Judge.*

—————————

ARGUED MAY 26, 2015 — DECIDED AUGUST 6, 2015

—————————

Before WOOD, *Chief Judge*, and EASTERBROOK and
WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. These appeals arise out of a
commuter airplane crash in May 2005 near Queensland,
Australia. One of the worst aviation accidents in Australian
history, all fifteen people on board died when the descend-
ing plane crashed into terrain. The administrators of the es-
tates of the deceased sued several companies and one indi-
vidual, alleging that they contributed to the crash. In this
opinion, we have consolidated two appeals: the first is the
plaintiffs' case against the successor to the plane's manufac-
turer and the second is against the manufacturer of the
plane's warning system and the maker of navigational
charts. In both appeals, the district court granted the defend-
ants' motions for summary judgment. Because we find that
the successor had no duty to warn the plane's operator of the
need to install a more enhanced warning system, and the

operator did not rely on any alleged voluntary undertaking of a duty to warn, we affirm the district court's grant of summary judgment for the successor in the first appeal. Also, because we find that the plaintiffs did not properly present any evidence from which a reasonable jury could infer that the defendants' products probably contributed to the crash, and because the warning system's manufacturer had no duty to alert the customer that an improved system should be installed, we affirm the decision of the district court in the second appeal.

## I. BACKGROUND

On May 7, 2005, a commuter aircraft, operated by Transair, crashed into terrain on its way to the Lockhart River airfield in Queensland, Australia. Sadly, the crew and passengers did not survive. Plaintiffs, as administrators of the estates of all but one of the deceased, sued several defendants for their roles in the crash. The aircraft that crashed was a Fairchild SA227-DC Metro 23, Registration Number VH-TFU (hereinafter "Aircraft").

### A. M7 Aerospace

The first appeal addresses the case against M7 Aerospace LP ("M7"), the successor to the Aircraft's manufacturer Fairchild Aircraft Inc. ("Fairchild"). Now defunct, Fairchild was an aircraft and aerospace manufacturing company that was a wholly-owned subsidiary of Fairchild Dornier, a German corporation. In 1990, the Federal Aviation Administration (FAA) issued Fairchild a Type Certificate to manufacture SA227-DC Metro aircrafts ("Metros").[1] In 1992, Fairchild

---

[1] The Type Certificate indicates that the manufacturer has met the FAA's requirements and gives the holder exclusive ownership of certain

manufactured the Aircraft, a Metro, and sold it in January 1993 to Aerovias de Mexico, a non-party Mexican airline. It was later transferred to other owners, and at some point between 1993 and 2005, Transair acquired the Aircraft.

In 2000, Fairchild ceased manufacturing and sold its last Metro. In 2002, it filed for bankruptcy in the Western District of Texas. At an auction during the bankruptcy proceedings, 4M Investments LLC bid and won the purchase of Fairchild's assets. It executed an Asset Purchase Agreement with Fairchild which the bankruptcy court approved, stating that the assets would be free and clear of any liens, claims, and encumbrances. In 2003, 4M assigned the Asset Purchase Agreement to Defendant M7.

M7 is a privately held small business whose owners had no prior relationship with Fairchild. It operates from a facility in San Antonio that it purchased from Fairchild. As a result of the acquired assets, M7 owns the rights to use the Fairchild name and to Fairchild's technical publications. Additionally, M7 acquired the Type Certificate and was designated as the Original Equipment Manufacturer (OEM) for the Metro fleet. As holder of the Type Certificate and as the OEM, M7 has the exclusive right to manufacture proprietary parts for the Metro aircrafts. In 2003, M7 began operations with three primary business units focusing on Metros and another line of aircraft: (1) part and product support division, (2) government contracts division, and (3) maintenance, repair, and overhaul operation. In its San Antonio facility,

---

technical data, including drawings, reports, and analysis used to either build, substantiate, or validate the aircraft design.

M7 builds and assembles aircraft parts for other aerospace companies, but it has never manufactured any aircraft.

M7's operations include distribution of a catalogue of parts for the Metro aircraft, sale of flight, maintenance, and inspection manuals to known Metro owners and operators, and technical support. It issues service bulletins and maintains and updates a list of Metro owners and operators. However, operators do not need to seek M7's approval or inform it of a sale, so the list is informal and largely based upon orders for parts or the owners' initiation of contact with M7. Transair was listed on a revised service customer list. That is to say, Transair at some point purchased parts from M7, but it is unclear whether Transair was purchasing parts for the Aircraft or another plane.

The plaintiffs' primary dispute with M7 concerns the Aircraft's ground proximity warning system. At the time of the crash, the Aircraft was likely fitted with a Ground Proximity Warning System (GPWS), which alerts the crew of approaching terrain. It was not fitted with an Enhanced Ground Proximity Warning System (EGPWS), which has the capacity to alert the crew more quickly of terrain than the GPWS and provides the pilots with more time to react. The Australian Transportation Safety Bureau (ATSB) concluded that if the plane had been equipped with an EGPWS, the crash could have been avoided. The plaintiffs maintain that M7 should have warned Transair of various defects in the Aircraft, particularly of the need to install an EGPWS.

The plaintiffs filed a negligence and strict products liability action against numerous defendants including M7. Six counts in the second amended complaint pertained to M7, four for indirect liability and two for direct liability. First, the

plaintiffs sought to impose liability vicariously on M7 as successor-in-interest for the actions of its predecessor Fairchild, but the district court granted summary judgment for M7 on these counts, and the plaintiffs do not appeal. The plaintiffs also sought to directly impose liability on M7 for its alleged negligent breach of its own duty to warn and advise under operation of law and, in the alternative, under a theory of voluntarily undertaking a duty to warn. The district court granted summary judgment for M7 on these direct liability theories, and the plaintiffs appeal.

### B. Jeppesen and Honeywell

The second appeal addresses the plaintiffs' case against two companies, Jeppesen Sanderson ("Jeppesen") and Honeywell International ("Honeywell"). Because cloud cover did not allow the flight crew to make a visual approach on the day of the crash, the pilots used what is called an RNAV instrument approach. An RNAV instrument approach is a non-precision approach using cockpit instruments, including a global positioning system, to navigate between waypoints along a flight path. Jeppesen produced and sold charts for pilots to use while performing non-visual approaches into the Lockhart River airfield. It received source data for its approach charts from Airservices Australia ("ASA"), an entity owned by the Australian government. ASA designed the approach procedure into Lockhart River airfield. The pilots of the Aircraft subscribed to Jeppesen's chart service, but we do not know for sure if the pilots actually used Jeppesen's charts while descending on the day of the crash. Jeppesen's charts complied with ASA's requirements, but they did not indicate topography of the terrain below the descent path. That is, they did not show the altitude of the mountain range

beneath the flight path. The Aircraft crashed into the South Pap ridge at an altitude of approximately 1,210 feet when it descended at a steeper angle than prescribed in the Jeppesen charts and flew below the 2,060-foot minimum safe altitude for its location.

Honeywell manufactured GPWS units. It purchased the GPWS business from Hamilton Sundstrand in 1993. It manufactured a GPWS unit which was fitted on the Aircraft in 2003 (but no wreckage of a GPWS unit was found after the crash). Honeywell also manufactured and sold EGPWS units, but it did not sell the EGPWS to the Aircraft's operator or tell the operator to purchase an EGPWS.

After the crash, the ATSB investigated the potential causes of the accident and published a detailed report. The ATSB report concluded that the plane crashed as a "result of a controlled flight into terrain; that is, an airworthy aircraft under the control of the flight crew was flown unintentionally into terrain, probably with no prior awareness by the crew of the aircraft's proximity to terrain." The ATSB could not determine why the Aircraft flew into the ridge, largely because the plane's cockpit voice recorder failed to record any audio of the cockpit and there were no survivors or witnesses. But the report identified several "contributing safety factors" as well as "other safety factors." One of the "other safety factors" was that Jeppesen's approach chart could cause a pilot to lose situational awareness. The report noted several deficiencies in the design of the Jeppesen chart, mostly related to the ways in which the chart's depictions could be clearer. As mentioned, the report also noted that the accident could have been avoided if the Aircraft had an EGPWS.

The plaintiffs brought strict liability and negligence claims against Jeppesen for its charts and Honeywell for its GPWS. Along with two other defendants (the cases against whom the plaintiffs have not appealed), Jeppesen and Honeywell filed motions for summary judgment. The motions were granted, and this appeal followed.

## II. ANALYSIS

### A. Appellate Jurisdiction

Before turning to the merits of the plaintiffs' claims, we must address two jurisdictional issues that the plaintiffs raised in the second appeal. First, the plaintiffs argue that there is no appellate jurisdiction over the second appeal, despite being the party that filed the notice of appeal. At oral argument, the plaintiffs' counsel informed the court that he "jumped the gun" in filing the notice. In his view, because the district court had not disposed of all claims in the case, there is no appellate jurisdiction. However, he did not wish to move to dismiss the appeal, and the plaintiffs' brief asks us to remand the case to the district court so that the district court could rule on all of the claims. If we truly do not have appellate jurisdiction, we cannot remand the case to the district court or instruct the district court to do anything; we can only dismiss the appeal. *See e.g.*, *In re Mut. Fund Market-Timing Litigation*, 468 F.3d 439, 441 (7th Cir. 2006).

Courts of appeals have jurisdiction of appeals from all final decisions of the district courts. 28 U.S.C. § 1291. "A final decision is one by which a district court disassociates itself from a case." *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897 (2015). "When a district court believes it is done with a case, it enters a final judgment under Rule 58." *Luevano v. Wal-*

*Mart Stores, Inc.*, 722 F.3d 1014, 1020 (7th Cir. 2013). Once a district court signals that it is finished with its work by entering final judgment under Rule 58, its order is final and appealable. *Id.*

Here, the district court granted the defendants' motion for summary judgment on July 8, 2014. The following day, the district court entered judgment under Federal Rule of Civil Procedure 58. Its order is therefore appealable. The plaintiffs argue that we lack appellate jurisdiction because the district court's summary judgment order did not dispose of all the plaintiffs' claims against defendant Honeywell, nor the defendants' third-party claims against ASA for contribution or defendants' and ASA's counterclaims against certain plaintiffs. First we note that while the district court did not mention the defendants' third-party claims against ASA or ASA's counterclaims against certain plaintiffs, by entering judgment in the defendants' favor, these claims were "necessarily adjudicated" by the judgment, *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011), and do not "logically survive," *Am. Nat'l Bank & Trust Co. of Chicago v. Sec'y of Hous. & Urban Dev.*, 946 F.2d 1286, 1290 n.6 (7th Cir. 1991). The plaintiffs seem to recognize this point, since they did not press the absence of a direct comment on the third-party claims or counterclaims in their reply brief or at oral argument.

With respect to the plaintiffs' fifth count against Honeywell which the district court did not directly address in its summary judgment order, lack of comment on that count does not negate our jurisdiction. *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 358 (7th Cir. 2009). The district court's order "effectively ended the litigation and

thus constituted a final order for the purposes of appellate review." *Id.* (internal quotations omitted). That is, the district court indicated that it was finished with the case and did not contemplate further activity. *Id.* Therefore, we have appellate jurisdiction. *Id.* The fifth count, while making some different factual allegations from the other counts in the complaint, did not constitute a separate basis of liability, but was instead a claim for punitive damages. The plaintiffs may argue that there were deficiencies in the district court's reasoning or arguments which it failed to address, but those are merits arguments. We still have appellate jurisdiction. And as the district court likely bore in mind, we recognize that if there is no evidence supporting liability, then there is no basis for punitive damages.

## B.  Subject Matter Jurisdiction

In the second appeal, the plaintiffs also challenge our federal subject matter jurisdiction.[2] The plaintiffs originally brought this action in Illinois state court in May 2007. The parties actively litigated in state court for the next four years until July 2011, when the defendants filed third-party claims against ASA for contribution and indemnity. The Foreign Sovereign Immunities Act gives foreign states the right to remove to federal court any action filed against them in state court. 28 U.S.C. § 1441(d). Exercising its right as a foreign sovereign then, ASA removed this action to the United States District Court for the Northern District of Illinois. ASA then moved to dismiss the claims against it based upon the stat-

---

[2] Curiously, they did not challenge subject matter jurisdiction in the first appeal. But if there is no subject matter jurisdiction in No. 14-2481, then there is no subject matter jurisdiction in No. 14-1707.

ute of limitations, and the plaintiffs moved to remand based upon fraudulent joinder of ASA. These motions were denied. Two years after removal, the plaintiffs again sought to remand the case under the doctrine of fraudulent joinder, asserting that the third-party claims against ASA were barred by the statute of limitations and therefore had no chance of success. The district court denied this motion, and the plaintiffs appeal.

Here, we must again reject the plaintiffs' remand request, couched as a challenge to federal subject matter jurisdiction. The plaintiffs do not dispute that the parties are diverse; the plaintiffs are Australian citizens and the defendants are U.S. corporations and a U.S. citizen. The amount in controversy exceeds $75,000. So federal subject matter jurisdiction plainly exists under 28 U.S.C. § 1332. By suing an Illinois citizen (Matthew Heir), the plaintiffs prevented the defendants from being able to remove the original action to federal court. *See* 28 U.S.C. § 1441(b)(2). But even without ASA as a third-party defendant, federal courts have original diversity jurisdiction over this action. *See* 28 U.S.C. § 1332; *Morris v. Nuzzo*, 718 F.3d 660, 665 (7th Cir. 2013) (§ 1441(b)(2)'s "forum defendant rule" is not jurisdictional). Whether the case was properly removed to federal court is a matter of removal procedure, not jurisdiction. *Id.*

Still though, the plaintiffs argue that because ASA was fraudulently joined, this case was not properly removed to federal district court, and it could not have been removed in ASA's absence. They say ASA was fraudulently joined because it was joined four years after the original action was filed, so Illinois's two-year statute of limitations had run. In their view, the defendants fraudulently misrepresented to

the court that they did not have any knowledge of a potential claim against ASA until November 2009. Under Illinois's discovery rule, the statute of limitations begins to run when the potential plaintiff knows or reasonably should know of his injury and that the injury was wrongfully caused. *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981). The plaintiffs contend that the triggering event here for the commencement of the statute of limitations for the defendants' third-party claim for contribution against ASA is the date the defendants first knew or reasonably should have known of an act causing them injury and placing them on inquiry to determine whether a cause of action exists. *See Brdar v. Cottrell, Inc.*, 867 N.E.2d 1085, 1100 (Ill. App. Ct. 2007). To them, the defendants knew of at least one of their claims against ASA as early as May 4, 2007, the date the plaintiffs filed their complaint in state court. They argue that as soon as the defendants knew that the plaintiffs had a claim against Jeppesen for defects in the Jeppesen navigation charts, the defendants knew they had a third-party claim against ASA because ASA provided the source material for the navigation charts.

While ASA certainly has a strong claim that the statute of limitations has run (and the plaintiffs have cogently made this argument on its behalf), that is not the standard we must use to determine whether or not *jurisdiction* exists. Jurisdiction is not defeated by the possibility that the allegations might fail to state a cause of action on which a party could actually recover. *Bell v. Hood*, 327 U.S. 678, 682 (1946). The failure to state a proper cause of action calls for a judgment on the merits and not a dismissal for want of jurisdiction. *Id.* "Whether the complaint states a cause of action on which relief could be granted is a question of law and just as

issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Id.*; *see also Jogi v. Voges*, 480 F.3d 822, 825–26 (7th Cir. 2007) ("the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction"). The *Bell* standard does provide for an exception. A suit may be dismissed for want of jurisdiction where the alleged claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell*, 327 U.S. at 682–83). We cannot say that the claims against ASA were so patently without merit as to justify a dismissal for want of jurisdiction. The district court noted that defendants argued they did not know they had a claim against ASA until 2009, when ASA redesigned the flight path, indicating that a safer approach path was possible. While the defendants might have ultimately failed on the merits of their third-party claims, the claims were not insubstantial, frivolous, or clearly immaterial.

The standard for fraudulent joinder is similarly demanding of the plaintiffs (if it is even applicable in this situation). The defendants need to have "no chance of success" in their claims against ASA. *Morris*, 718 F.3d at 666 (quoting *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992)). A party seeking a different forum on the basis of fraudulent joinder bears a heavy burden to show that, after resolving all issues of fact and law in favor of the non-moving party, the non-moving party cannot establish a cause of action. *Poulos*, 959 F.2d at 73. We also find that the plaintiffs have not carried this burden. The defendants have some chance of success.

**C. The First Appeal: M7 Aerospace**

On appeal, the plaintiffs challenge the district court's grant of summary judgment for M7 on two grounds. First, they argue that the district court erred in finding that M7 did not have a duty to warn by operation of law about the need to install an EGPWS.[3] Second, they argue that the district court erred in not finding that M7 had voluntarily undertaken a duty to warn. We review the district court's grant of summary judgment de novo. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). A federal court sitting in diversity applies state substantive law, *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 303 (7th Cir. 2010), and the parties agree that Illinois law governs here. It may seem counterintuitive to apply Illinois law to this dispute when none of the relevant conduct occurred in Illinois. However, the parties both cite to it and no one has pointed out a conflict between the bodies of law that might apply. So, we apply the law of the forum state. *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 (7th Cir. 1993).

**1. No Duty to Warn by Operation of Law**

A duty is a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another. *Kurtz v. Wright Garage Corp.*, 635 N.E.2d 897, 899 (Ill. App. Ct.

---

[3] The plaintiffs suggest that M7 had a duty to warn of other defects besides the need for an EGPWS. But like the district court, we find that the plaintiffs do not elucidate the nature of any alleged defects other than the absence of an EGPWS, and so we will focus on the warning system as the district court did. To the extent the plaintiffs try to argue about other alleged "defects," they have waived those arguments by failing to raise them on summary judgment. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

1994). Illinois courts have recognized a limited cause of action against the purchaser of a product line for failing to warn of defects in its predecessor's products. *Caballero v. Uniloy Milacron, Inc.*, No. 02 C 3086, 2003 WL 22053629 at *8 (N.D.Ill. 2003). To determine the presence of a nexus or relationship effective to create a duty to warn, the following factors have been considered: (1) the succession to a predecessor's service contracts; (2) coverage of the particular machine under a service contract; (3) service of that machine by the purchaser corporation; and (4) a purchaser corporation's knowledge of defects and the location or owner of that machine. *Gonzalez v. Rock Wool Eng'g & Equip. Co.*, 453 N.E.2d 792, 795 (Ill. App. Ct. 1983); *see also Kaleta v. Whittaker Corp.*, 583 N.E.2d 567, 574 (Ill. App. Ct. 1991). "[T]he critical element required for the imposition of this duty is a continuing relationship between the successor and the predecessor's customers benefiting the successor." *Gonzalez*, 453 N.E.2d at 795.

The district court found that there was an insufficient nexus between M7 and Transair to impose an independent duty to warn on M7, and we agree. None of the four *Gonzalez* factors are met, and the plaintiffs have not presented evidence of *any* relationship between M7 and Transair with respect to the Aircraft. M7 did not assume any of Fairchild's service contracts; consequently, the Aircraft was not covered by any service contract. M7 never serviced the Aircraft, and there is no evidence that M7 knew Transair was the current owner and operator of the Aircraft. The plaintiffs argue that because Transair was included on M7's customer list, M7 knew the identity and location of the operator of the Aircraft. While this evidence may establish that M7 knew of the existence of Transair as an airline in general, the plaintiffs

have presented no evidence from which a reasonable jury could conclude that M7 knew Transair was the operator of this Aircraft. The plaintiffs do not even allege that M7 knew Transair was the operator of the Aircraft.

The plaintiffs argue that the district court should not have placed so much emphasis on the fact that the first two *Gonzalez* factors were not met, because they were impossible to meet: Fairchild did not have any service contracts for M7 to assume. The lack of service contracts could be indicative of a diminished continuing buyer-seller relationship such that their absence would weigh on the "no duty" side of the scale. However, even if we were to accept the plaintiffs' preferred position of marking the first two factors with "not applicable," the plaintiffs fail the last two factors as well. M7 never serviced, maintained, or repaired the Aircraft. *See Gonzalez*, 453 N.E.2d at 795 (no duty to warn where successor did not service, maintain, or repair the machine involved in the accident). And M7 did not know the location of the Aircraft or who its current owner was.

The plaintiffs make much of the fact that M7 had a continuing relationship with the product line in general, including servicing other Metros and issuing service and safety bulletins. However, Illinois courts have refused to adopt the product line exception to the general rule of nonliability for a purchaser of assets, *Kaleta*, 583 N.E.2d at 572, and have been hesitant to impose a duty on a successor corporation "unless circumstances following the corporate transfer give rise to the duty," *Nguyen v. Johnson Mach. & Press Corp.*, 433 N.E.2d 1104, 1109 (Ill. App. Ct. 1982). Illinois decisions addressing the duty to warn by operation of law reject imposing liability where there is not a continuing relationship between the

successor and owner with respect to the specific machine in-
volved in the accident. *See Kaleta*, 583 N.E.2d at 574 ("Our
review of the record has found no evidence of a continuing
relationship between Tug and American [A]irlines with re-
spect to servicing of the 660 line of beltloaders."); *see also*
*Gonzalez*, 453 N.E.2d at 795 ("[I]n the absence of any evi-
dence indicating a continuing relationship between Bemis
and Forty-Eight Insulations, we find that there is no basis for
the imposition of liability upon Bemis for breach of a duty to
warn.").[4]

The plaintiffs essentially ask us to impose a duty to warn
where the successor has a relationship with the product line
in general, but not with the specific owner (beyond the in-
clusion of Transair on a mailing list for possibly unrelated
products) and the specific machine. But we are not at liberty
to impose our own view as to what the law of a state should
be. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 441 (7th Cir.
1977). Illinois courts have consistently chosen not to recog-
nize product line successor liability for a variety of policy
reasons, *see Diguilio v. Goss Int'l Corp.*, 906 N.E.2d 1268, 1278
(Ill. App. Ct. 2009), and so we must reject the plaintiffs' ar-
gument that as a policy matter, we should plug a supposed
gap in tort law. Notably, the Illinois Supreme Court has
found that even a corporation in Fairchild's position would

---

[4] The use of the word "continuing" is informative in our conclusion
that the relevant relationship is the one that is a continuation of the pur-
chased (allegedly defective) product. The plaintiffs have not presented
evidence that any relationship between Transair and M7 is related to,
and thus a continuation of, Transair's acquisition of the Aircraft. That
Transair may have bought products for other planes from M7 does not
show an ongoing relationship with respect to the Aircraft.

not have a duty to warn Transair to install an EGPWS, since
the allegedly defective GPWS was not installed until 2003,
ten years after Fairchild sold the plane to Aerovias. *See Ja-
blonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1160 (Ill. 2011)
("[A] manufacturer is under no duty to issue postsale warn-
ings or to retrofit its products to remedy defects first discov-
ered after a product has left its control.") (internal citations
and quotations omitted)).[5] Considering the evidence in the
light most favorable to the plaintiffs, under Illinois law, there
is not enough of a continuing relationship between M7 and
Transair with respect to the Aircraft to justify the imposition
of a duty.

### 2. No Voluntary Undertaking of a Duty to Warn

In addition to a duty to warn by operation of law, Illinois
law offers a voluntary assumption of duty theory. *Ordman v.
Dacon Mgmt. Corp.*, 633 N.E.2d 1307, 1310 (Ill. App. Ct. 1994).
"In situations in which a duty would not otherwise arise, a
duty to act reasonably may be imposed when a defendant
negligently performs a voluntary undertaking." *Id.* The theo-
ry of voluntary assumption of a duty is narrowly construed.
*Bell v. Hutsell*, 955 N.E.2d 1099, 1104 (Ill. 2011). "The extent of
the duty imposed on one who voluntarily undertakes to per-
form an act is limited to the extent of the undertaking."
*Ordman*, 633 N.E.2d at 1310. And where, like here, the plain-

---

[5] Since the plaintiffs have brought up pragmatic, policy concerns, we
note that Transair (and seemingly everyone in the aviation industry)
knew of the need to install an EGPWS. In 2000, the FAA mandated that
Metro owners install an EGPWS by March 2005. The ATSB required in-
stallation by June 2005. It is tragic that this accident occurred less than
two months prior to the Australian regulatory deadline, but it is unclear
how any warning from M7 would have made a difference.

tiff seeks to hold the defendant liable for nonfeasance (omission to perform a voluntary undertaking) rather than misfeasance (negligent performance of a voluntary undertaking), Illinois law requires that the harm suffered must be a result of one's reliance upon the undertaking. *Bell*, 955 N.E.2d at 1107–08.

We agree with the district court that even if the plaintiffs were able to show that M7 voluntarily undertook the task of warning Transair of the need to install an EGPWS, the plaintiffs have not established reliance. In *Frye v. Medicare-Glaser Corp.*, the Supreme Court of Illinois upheld the grant of summary judgment for the defendants because there was "no evidence" that the plaintiff's injury "was due to his reliance on the defendants'" actions. 605 N.E.2d 557, 560 (Ill. 1992). Similarly here, the plaintiffs have failed to provide any evidence that demonstrates that their injuries occurred because of Transair's reliance on M7. The plaintiffs contest the district court's statement that they had not proffered *sufficient* evidence of reliance as more burdensome than the summary judgment standard mandates, but we find that the plaintiffs have presented *no* evidence that Transair relied upon M7 to warn it of supposed defects. The plaintiffs argue that because M7 holds itself out as the original manufacturer and an authority on safety concerns for Metros, "it is logical to assume that owners and operators" rely on M7 to warn them of defects in the Metros. But whether other owners relied upon M7 to warn it of defects does not answer the question of whether Transair, the relevant entity, relied upon M7. And surviving summary judgment requires evidence, not assumptions. *Sybron Transition Corp. v. Sec. Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) ("A party must present more than mere speculation or conjecture to defeat a

summary judgment motion."). There is no evidence that Transair read M7's newsletters, regularly checked the service bulletins, communicated with M7, or attended any of M7's conferences. Furthermore, Transair knew of the need to install an EGPWS. It is actually illogical to think that Transair relied upon M7's lack of warning as justification for not installing an EGPWS, when Transair was required by the ATSB to install the system.

### D. The Second Appeal: Jeppesen and Honeywell

Jeppesen and Honeywell sought summary judgment on all claims against them, asserting that the plaintiffs had not established a prima facie case that their products contributed to the cause of the crash and that Honeywell owed no duty to advise of the existence of a superior product. The district court agreed. Again, we review the grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to the non-moving party. *Piltch v. Ford Motor Co.*, 778 F.3d 628, 631 (7th Cir. 2015).

Unfortunately for the plaintiffs, few facts in their favor were properly before the district court when it was ruling on these defendants' motions for summary judgment. That is because the plaintiffs failed to comply with Local Rule 56.1. They did not file a response to the defendants' statement of facts or their own statement of facts in response to any of the defendants' motions for summary judgment. *See* Local Rule 56.1(b)(3) (requiring the non-moving party at the summary judgment stage to file a reply, including "a response to each numbered paragraph in the moving party's statement" as well as "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," with appropriate references to the rec-

ord). So the district court only considered those facts included in the defendants' statement of material facts.

The plaintiffs do not object to any of the defendants' statements of facts, so they do not quarrel with those facts being deemed admitted. *See id.* 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."). But they argue that the district court should have excused their failure to comply with Local Rule 56.1 by not filing their own statement of facts and considered the expert report and witness affidavits which they submitted, concededly in violation of Rule 56.1, in order to prevent manifest injustice. We review the decision of a district court concerning compliance with local rules such as Rule 56.1 only for an abuse of discretion. *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1108 (7th Cir. 2004). This court has repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions, *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009), including by disregarding evidentiary documents because a required statement of facts was not filed, *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). While the plaintiffs' attorney offers excuses here for his failure to comply, these excuses were not presented to the district court. District courts are not obliged to scour the record looking for factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). The district court's application of Rule 56.1 here was no abuse of discretion.

### 1. Jeppesen: No Evidence of Causation

In their complaint, the plaintiffs allege Jeppesen negligently prepared the navigation charts the pilots used in conducting their approach to the Lockhart River airfield. They claim that the failure of Jeppesen's charts to include the elevation of the terrain directly beneath the flight path, the failure to depict any terrain with colored contours and values, and the failure to depict an offset between the approach and the runway caused the pilots to believe they were safely flying over a valley and not over the mountain into which they ultimately crashed. They also allege that the manner in which other information was depicted and the failure to include certain information on the Jeppesen charts caused the pilots to become confused, lose situational awareness, believe they were further along the flight path than they were, descend below the minimum safe altitude and crash. The problem however is that the plaintiffs have failed to come forward with any evidence from which a reasonable jury could infer causation.

Under Illinois law,[6] in a products liability action, whether based on strict liability or negligence, the plaintiff must demonstrate a causal relationship between the injury and the manufacturer's product. *Tragarz v. Keene Corp.*, 980 F.2d 411, 418 (7th Cir. 1992) (citing *Zimmer v. Celotex Corp.*, 549 N.E.2d 881, 883 (Ill. App. Ct. 1989)). The causal relationship can be

---

[6] Like the district court, we apply Illinois law because Jeppesen asserts, and the plaintiffs do not contest, that there is no conflict between federal, Illinois, and Queensland law on this issue. *Gould*, 1 F.3d at 549 n.7 ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we apply the law of the forum state—here, Illinois.").

proven by circumstantial evidence. *Id.* But in order to get to the jury, the plaintiff must demonstrate more than a mere possibility that the product caused the injury. *Id.* Rather, the plaintiff must come forward with evidence justifying an inference of probability. *Id.*

First, we note that the plaintiffs say the district court imposed an incorrect burden on them. They claim that the district court required them to show that the defects in the defendants' products probably contributed to the crash, but the plaintiffs' only burden was to show an *inference* of probability. We disagree. The district court cited and applied the correct standard.

Given that the plaintiffs failed to comply with Rule 56.1, the district court tried to give them *something* by looking at the conclusions of the ATSB report to determine whether anything in the report supported causation. But the plaintiffs argue that reliance on the conclusions of this report was improper (despite relying upon the same report in trying to piece together evidence warranting an inference of causation). They claim that the district court should not have relied upon the inadmissible conclusions of the ATSB report because the ATSB report used a standard of a 66% or more likelihood to determine whether something was a "contributing safety factor," but the burden in civil litigation in Illinois is only 50% or more likelihood. But the district court did not heighten the burden of proof for the plaintiffs. It knew that the report used a 66% or greater standard. It did not rely upon the ATSB report to find that the plaintiffs could not survive summary judgment. It relied on the fact that no evidence was properly before it that would warrant an inference of causation (since the plaintiffs had not complied with

Rule 56.1). It merely looked at the ATSB report to determine whether anything in it could warrant such an inference. But if we disregard the conclusions of the ATSB report—as the plaintiffs contend we should—we are still left with nothing to support an inference of causation.

There is no evidence from which a reasonable jury could infer that Jeppesen's charts probably contributed to the crash. No one survived the crash. There is no cockpit voice recording. We do not know for sure whether or not the pilots were using the Jeppesen charts when they descended. Even if they were using the charts, there is no evidence from which a jury could infer that the plaintiffs' version of the accident actually occurred. The plaintiffs do not argue that the Jeppesen charts were inaccurate or did not comply with the ASA's requirements. They mostly rely on the factual findings of the ATSB report which described various ways that the charts could have been improved. But they have nothing to establish that any flaws in the charts actually caused the pilots to lose situational awareness or otherwise decide to descend below the minimum safe altitude. The plaintiffs would like for us to allow this case to reach a jury based on the argument that because they can establish that the charts were flawed, we can infer that the charts probably contributed to the crash. But this speculation is impermissible. *See Tragarz*, 980 F.2d at 418; *Rahic v. Satellite Air-Land Motor Serv., Inc.*, 24 N.E.3d 315, 322 (Ill. App. Ct. 2014) ("Liability against a defendant cannot be predicated on speculation, surmise, or conjecture.").

We agree with the district court that there was no evidence properly before the district court that Jeppesen's

charts probably contributed to the crash,[7] so summary judgment was appropriate.

### 2. Honeywell

On appeal, the plaintiffs claim that Honeywell's GPWS failed to give an alert and therefore caused the crash. They also claim that Honeywell negligently sold the GPWS to the initial operator when it knew the design of the GPWS was outdated and that the more effective EGPWS was available, and failed to advise this initial purchaser to get an EGPWS instead of a GPWS.

First we must decide which law governs the plaintiffs' claims against Honeywell. At summary judgment, Honeywell argued that the court should apply Washington law because the relevant conduct—the design and manufacture of the GPWS unit—occurred in Washington. However, on appeal, Honeywell no longer presses this argument, so it is waived. *Ricci v. Arlington Heights, Ill.*, 116 F.3d 288, 292 (7th Cir. 1997) (arguments not raised in a brief are waived). Since the plaintiffs contend that Illinois law applies, Honeywell has not contested this, and the parties have not presented a

---

[7] The plaintiffs argue that the district court went beyond the scope of Rule 56.1 by ignoring their references to evidence in the record submitted by the defendants, including deposition testimony from employees of the defendants. They reference these depositions in their arguments to this court as well. However, the full transcripts of these depositions were not part of the defendants' summary judgment submissions. The evidence the plaintiffs seek to rely on was not properly before the district court. We have ignored it as well since our review is limited to the evidence properly before the district court. *Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 596 (7th Cir. 2012).

conflict in the two bodies of law to this court, we apply Illinois law. *See Gould*, 1 F.3d at 549.

### a. No Evidence of Causation

With respect to the plaintiffs' defective or negligent design and manufacture claims, we find that, like Jeppesen, the plaintiffs have not presented any evidence from which a reasonable jury could infer that any defect in the GPWS probably contributed to the crash. *See Tragarz*, 980 F.2d at 418. Again, the plaintiffs contend that the district court imposed a heightened burden regarding causation on them and that the district court improperly relied upon conclusions of the ATSB report. For the reasons stated in the Jeppesen discussion above, these arguments are rejected.

No GPWS unit was found in the wreckage, so we do not know for sure whether the GPWS was on the Aircraft that day. The Aircraft's cockpit voice recorder was not functioning, so it did not capture the crew's dialogue or any alerts that a GPWS may have provided, and there are no surviving witnesses to testify about the performance of the GPWS. Because of these limitations, the plaintiffs rely largely on the ATSB report to argue that the GPWS was defective and its defects caused the crash.[8] According to the factual findings of the ATSB report, a functioning GPWS would have given a "terrain, terrain" warning at 25 seconds before impact, which the pilots may have ignored because the same warning is given when an aircraft has cleared terrain. It also

---

[8] Again, the plaintiffs seek to rely on other evidence which they failed to submit to the district court in compliance with Local Rule 56.1. The district court ignored that evidence, and so do we. *See Blue,* 698 F.3d at 596.

would have given a "terrain, terrain, pull up" warning at five seconds before impact. The plaintiffs argue that the GPWS computer must have been defective because the flight crew did not pull up as the plane approached the South Pap ridge. A functioning GPWS would have given an alert five seconds before impact, but the flight crew did not pull up in a manner that would indicate a response to the five-second warning. But regardless, according to the ATSB report, an alert five seconds before impact would not have provided the flight crew with enough time to avoid crashing into the ridge (and the plaintiffs do not contend that it would have). So even if the plane was fitted with a GPWS manufactured by Honeywell, and the GPWS malfunctioned or was defective as the plaintiffs claim, the plaintiffs have not presented any evidence from which a jury could conclude that any defect in the GPWS contributed to the crash.

We note that at times, the plaintiffs also seem to argue that the GPWS was defective because it did not give more advanced warnings like the EGPWS would have. Expert testimony is required to establish that a product is defective or unreasonably dangerous, *Show v. Ford Motor Co.*, 659 F.3d 584, 588 (7th Cir. 2011), but the plaintiffs have failed to present such evidence. Also, a product is not defective simply because an improved product hits the market that does more than the previous version. *See Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E2d 101, 111 (Ill. App. Ct. 2010) (stating a manufacturer's duty to design reasonably safe products "does not require the product to reflect the safest design possible … . [T]he threshold question is not whether the product could have been made safer, but whether it is dangerous because it fails to perform in the manner reasonably

to be expected in light of its nature and intended function.") (internal citations and quotations omitted).

### b. No Duty to Warn

And with this mention of the EGPWS, we move to the plaintiffs' last claim on appeal, which is that the district court erred in finding that Honeywell did not have a duty to warn operators of the need to install an EGPWS. The plaintiffs contend that the district court failed to consider their claim that Honeywell did not advise the initial purchaser of the GPWS (the Mexican airline) of the alleged "defects" in the GPWS and that it should instead purchase an EGPWS. In their opening brief, the plaintiffs did not contest the district court's finding that Honeywell did not have a duty to warn Transair, so that argument is waived. *See Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012).

In their reply brief, the plaintiffs cite generally *Proctor v. Davis*, 682 N.E.2d 1203 (Ill. App. Ct. 1997) and *Fuller v. Fend-All Co.*, 388 N.E.2d 964 (Ill. App. Ct. 1979) for the proposition that Honeywell had a duty to warn the initial purchaser of defects in the design of the GPWS. We agree with Honeywell that this argument is likely waived, since the plaintiffs did not cite to any legal authority to support their proposition that Honeywell had a duty in their opening brief. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). But even turning to the merits of the plaintiffs' claim, we agree with the district court that Honeywell did not have a duty to warn the initial purchaser. That is because the plaintiffs have not established that there was any "defect" in the design of the GPWS of which to warn. They failed to comply with

Rule 56.1, so little evidence in their favor is properly before this court. They have offered no evidence that the GPWS was actually defectively designed or dangerous. Their failure to come forward with expert testimony regarding any alleged design defect or dangerousness is fatal to their claim. *See Salerno*, 932 N.E.2d at 112 ("Because products liability actions involve specialized knowledge or expertise outside of a layman's knowledge, the plaintiff must provide expert testimony" to establish the product's dangerousness.).

Because the plaintiffs' claims of defect and causation are not supported by any evidence properly before the district court and because Honeywell owed no duty to warn any operator of the Aircraft of the alleged defects in the GPWS, the district court properly granted Honeywell's motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of the district court.